755 A.2d 1088

**Joe Roy METHENY**

v.

**STATE of Maryland.**

No. 149, Sept. Term, 1998.

Court of Appeals of Maryland.

July 24, 2000.

**582**

Julia Doyle Bernhardt, Assistant Public Defender (Nancy S. Forster, Assistant Public Defender and Stephen E. Harris, Public Defender, on brief), Baltimore, for appellant.

Rachel Marblestone Kamins, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

HARRELL, Judge.

The State charged Joe Roy Metheny, Appellant, with the first-degree premeditated murder and robbery of Catherine Magaziner in Baltimore City. The State timely filed a notice of intention to seek the death penalty, as well as life without parole.[1] On 25 September 1998, Appellant pled guilty to the charges in the Circuit Court for Baltimore County,[2] but elected a jury for the sentencing phase. The sentencing proceeding began on 9 November 1998 and, four days later, the jury sentenced Appellant to death based on its apparently unanimous finding of the aggravating circumstance that the murder was committed while Appellant was committing a robbery. The trial judge imposed the death sentence and a concurrent sentence of ten years in prison for the robbery conviction.

---

**1.** Maryland Code (1957, 1996 Repl.Vol., 1999 Supp.), Article 27, § 412, states in pertinent part:

(b) *Penalty for first degree murder.*—Except as provided under subsection (g) of this section, a person found guilty of murder in the first degree shall be sentenced to death, imprisonment for life, or imprisonment for life without the possibility of parole. The sentence shall be imprisonment for life unless: (1)(i) the State notified the person in writing at least 30 days prior to trial that it intended to seek a sentence of death, and advised the person of each aggravating circumstance upon which it intended to rely, and (ii) a sentence of death is imposed in accordance with § 413; or (2) the State notified the person in writing at least 30 days prior to trial that it intended to seek a sentence of imprisonment for life without the possibility of parole under § 412 or § 413 of this article.

(c) *Notice of intent to seek death penalty.*—(1) If a State's Attorney files or withdraws a notice of intent to seek a sentence of death, the State's Attorney shall file a copy of the notice or withdrawal with the clerk of the Court of Appeals.

(2) The validity of a notice of intent to seek a sentence of death that is served on a defendant in a timely manner shall in no way be affected by the State's Attorney's failure to file a copy of the death notice in a timely manner with the clerk of the Court of Appeals.

**2.** The charges were filed originally against Appellant in the Circuit Court for Baltimore City, but, due to pretrial publicity, the case was later transferred to the Circuit Court for Baltimore County.

Execution of Metheny's death sentence was stayed pending appellate review. The case is before us pursuant to the mandatory review provisions of Maryland Code (1957, 1996 Repl. Vol., 1999 Supp.), Article 27, § 414[3] and Maryland Rule 8–306(c)(1).[4]

Appellant advances four issues, which we have rephrased:

I. Did the State prove beyond a reasonable doubt that Appellant robbed Ms. Magaziner?

II. Did the evidence support the jury's finding of an aggravating circumstance under Maryland's death penalty statute or was the death penalty imposed upon Appellant under the influence of an arbitrary factor?

III. Did the trial court commit plain error in its instructions to the jury regarding the statutory aggravating circumstance that Appellant murdered the victim while committing or attempting to commit robbery?

IV. Did the jury's verdict sheet reveal a lack of unanimity as to the existence of the statutory aggravating circumstance, thus requiring that the death sentence be vacated?

---

**3.** Section 414 states in pertinent part:

(a) *Review by Court of Appeals required.*—Whenever the death penalty is imposed, and the judgment becomes final, the Court of Appeals shall review the sentence on the record.

\* \* \* \* \* \*

(e) *Considerations by Court of Appeals.*—In addition to the consideration of any errors properly before the Court on appeal, the Court of Appeals shall consider the imposition of the death sentence. With regard to the sentence, the Court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or court's finding of a statutory aggravating circumstance under § 413(d); and

(3) Whether the evidence supports the jury's or court's finding that the aggravating circumstances outweigh the mitigating circumstances.

**4.** Rule 8–306(c)(1) states: "Whenever a sentence of death is imposed, there shall be an automatic appeal to the Court of Appeals of both the determination of guilt and the sentence, whether or not the determination of guilt was based on a plea of guilty."

Although we affirm the convictions, we shall vacate the sentence of death as to the murder conviction, and remand that matter to the trial court for a new sentencing proceeding. The sentence for the robbery conviction is affirmed. Furthermore, because we reverse on Issue II, we need not address Issues III and IV.

## BACKGROUND

Appellant admitted to murdering and robbing Ms. Magaziner after he was arrested as a suspect in the unrelated murder of Ms. Kimberly Spicer. He agreed to plead guilty to the murder and robbery of Ms. Magaziner, but prayed a jury for the sentencing phase. As part of his guilty plea, Appellant and the State agreed to and signed a Statement of Facts [5] that was read into the record during the acceptance of the guilty plea proceeding and later disclosed to the jury during sentence consideration. The agreed facts pertinent to this appeal are as follows:

> If this case were tried, the State would present the following facts:

> \* \* \* \* \* \*

> On December 15, 1996 at approximately 1:40 a.m., members of the Baltimore City Police Department and the

---

**5.** The following paragraph is located at the conclusion of the written Statement of Facts and immediately above the signatures of Mr. Metheny, his counsel, and the prosecutors:

It is stipulated and agreed by both the State and the Defendant, Joe R. Metheny, that were the witnesses referred to in the Statement of Facts called to testify in Court, their testimony would be as contained in the above Statement, and both the State and the Defendant are hereby bound by the above Statement and agree that they have no evidence for presentation in the sentencing phase of these proceedings in contradiction of the facts recited above, and both the State and the Defendant agree to be bound by the facts recited herein for sentencing purposes with the understanding that, in the sentencing phase, both the State and the Defendant reserve the right to offer evidence in clarification and/or amplification of the facts contained in this Statement of Facts in support of the Defendant's guilty pleas in Case No. 98–CR–0233 [first degree premeditated murder] and 98–CR–0234 [robbery].

Federal Bureau of Investigation Task Force arrested the Defendant Joe R. Metheny, in an unrelated matter in the 1700 Block of Inverness Street, in Baltimore City.[6] A Baltimore City Police Officer transported him to the Homicide Unit of the Baltimore City Police Department.

During the course of the unrelated investigation, the Defendant gave several statements to detectives of the Baltimore City Police Department Homicide Division. A review of those statements would indicate that the Defendant met the Victim, Catherine Magaziner[,] one night in July 1994, and he took her to his trailer located at Joe Stein & Son Pallet Company. While in his trailer, he had sex with Ms. Magaziner while she was partially clothed. Ms. Magaziner had been in his trailer approximately one hour when the Defendant strangled her, and robbed her of her purse and clothing. Then the Defendant buried Catherine Magaziner in a shallow grave and buried her purse and clothing in a separate location.

Joe Stein & Son Pallet Company is located at 3200 James Street, which is in the southwest corner of Baltimore City. The Company is situated on a lot, which is adjacent to a wooded area. The Company has a locked entrance gate and is surrounded in part by an eight-foot high chain link fence with barbed wire on top. The lot is approximately the size of a square city block. There is a warehouse/office building that is surrounded by literally thousands of wooden pallets, which are stacked at varying heights throughout the lot. There is no business conducted at this Company or surrounding companies during the evening hours. James Street is a dead-end street where there is very little to no pedestrian traffic. The closest main thoroughfare is Washington Boulevard. The Defendant lived in a small one-room trailer located on the south fence. The nearest residential

---

6. At the sentencing phase, Detective Homer Pennington testified that the unrelated matter was a murder for which Mr. Metheny had been sentenced to life without the possibility of parole. This unrelated matter was the Spicer murder.

development to the Pallet Company is approximately two blocks away.

At approximately 3:05 p.m. on December 15, 1996, Defendant Metheny was advised of his rights pursuant to *Miranda v. Arizona* (hereinafter referred to as Miranda rights) by Detective Homer Pennington and Detective Sergeant Michael Newton, whereupon he waived same. In this statement the Defendant stated that he met a person approximately two years earlier (1994). As detailed later, she was subsequently identified as Catherine Magaziner. He persuaded Ms. Magaziner to go to his trailer at Joe Stein & Son Pallet Company, which is located in the 3200 Block of James Street in Baltimore City. He described Ms. Magaziner as possibly having brown hair; her build was "a little thin;" and, she was a "little tall" in stature. The Defendant stated that he strangled Ms. Magaziner and buried her body. He drew a diagram indicating the location where he buried the body. The Defendant stated that he buried Ms. Magaziner in a shallow grave, approximately two feet deep. He further stated that when he buried Ms. Magaziner, she was not dressed.

\* \* \* \* \* \*

On December 17, 1996 at 3:05 p.m., the Defendant was advised of his Miranda rights, and waived same. The Defendant gave an audio taped statement where he acknowledged that Detective Pennington escorted the Defendant to the 3200 Block of James Street for the purpose of pointing out where he had buried the female victim. The Defendant reiterated that he had strangled and buried the victim. Additionally, the Defendant indicated that after the body had been buried for about six months, he went back to the burial location and dug up and removed the skull. Afterwards, he threw the skull in a trash box. The box containing the skull was later removed to Oxford, Pennsylvania.

**588**

\* \* \* \* \* \*

The search team was unsuccessful in locating the body at that time. Due to the defendant's error in pointing out the location of the body, in addition to the topography of the area in question, and the attendant rain drainage, the cadaver dogs picked up the scent of the remains in the wrong locations. Consequently, Detective Pennington obtained a writ and again removed the Defendant from the Baltimore City Detention Center. Detective Pennington transported the Defendant back to Joe Stein & Son Pallet Company to assist in locating the body.

This time, after some hesitation, Metheny indicated to Detective Sergeant Lehmann an area approximately ten feet from the previously identified burial location. Additionally, Metheny indicated to the detectives the area where he had disposed of the buried woman's clothing and pocketbook. However, neither Detective Pennington nor other members of the investigation team were able to locate the Victim's purse or any of her clothing.

William C. Rodriguez, III, Ph.D., and the assembled excavation team conducted an excavation in the area that Metheny pointed out. The team used standard excavation techniques to carefully unearth the remains. [ ] It is notable that at the excavation site, Dr. Rodriguez discovered that the cranium was missing. The skeletal remains of Catherine Magaziner were recovered from a very shallow grave and transported to the Office of the Chief Medical Examiner.

Dr. William C. Rodriguez is an expert in forensic anthropology. In his report dated February 10, 1997, he indicated the following: [ ] "the absence of the cranium, and position of the mandible and right humerus is indicative of the remains having been disturbed prior to this excavation."

In Dr. Rodriguez's expert opinion, the morphology exhibited by the mandible and the postcranial skeleton is consistent with that of an adult female, and a craniometric analy-

sis indicated that the race is consistent with a Caucasoid. Ms. Magaziner was a Caucasian adult female.

Furthermore, he concluded "(A)dvanced environmental weathering exhibited by the remains are suggestive of a postmortem interval of approximately two to three years."

Dr. Rodriguez's excavation did not reveal any remnants of clothing. According to Dr. Rodriguez, the deterioration of clothing depends largely on the type of clothing, i.e. whether it is cotton or synthetic, as well as the soil composition. Clothing items such as rivets, zippers, seams of jeans, and elastic bands have a longer life span. He would have expected to find such clothing items as previously listed if clothing had been buried with the Victim.

\* \* \* \* \* \*

On December 18, 1996, the Defendant provided an audio taped statement at approximately 3:50 p.m. wherein the Defendant acknowledged having been transported to the 3200 Block of James Street where he did in fact indicate the exact burial location of the female victim.

In the December 18th statement, the Defendant admitted taking the Victim to his trailer at the 3200 Block of James Street around 8:00 or 9:00 p.m. and having sex with her. There are no details regarding this sexual act in this statement or any other statements.

Within an hour of taking Ms. Magaziner to his trailer, the Defendant used his hands and an extension cord to strangle Ms. Magaziner. When Detective Pennington asked Metheny, "How did you strangle her? Did you strangle her with your hands or ..." Metheny responded: "With my hands." Detective Pennington further questioned, "Did you use anything else?" Metheny answered, "I used an extension cord. I took the end of the cord, strangled her, she was ... passed out and I put a rope around her neck, ah, an extension cord, and killed her." The Defendant remarked that he then "drug her back into the woods and buried her."

Months later, he returned to where her body was buried and removed the skull.

When questioned about when he strangled the Victim, the Defendant initially indicated that "it was around July 3rd, '94." Detective Pennington asked, "(W)hy does July 3rd come to your attention?" The Defendant responded: "Cause I knew the 4th of July was right around that area. It might have been ... it might have been a couple ... It is, it's the first two weeks of July. I know that."

The Defendant gave identifying information to include that he believed that the Victim's first name was Cathy, the Victim was approximately 5'6"—5'7", about 120 to 130 pounds, had brunette hair, and was missing a couple of upper front teeth. She was wearing cut off jeans, white tennis shoes, socks, with a white pullover sweater and she had a purse.

Metheny also advised Detective Pennington that Ms. Magaziner was partially clothed when he, the Defendant, killed her.

In response to Detective Pennington's questions, "Well what, what, what happened to the clothes?" the Defendant stated: "I think I buried them with the purse." The Defendant reiterated that he had previously directed the Detectives to the area where the clothing and purse were buried. The Detective then asked: "What color shoes did you say he had?" The Defendant responded: "I believe it was white tennis shoes." The Detective responded: "White tennis shoes? (Pause). Did you, did you bury'em af ... her clothes after you buried her or ..." The Defendant responded: "Yeah."

In this interview the Defendant explained what he meant when he said he buried the clothes and the purse. He said, "I buried 'em but it was very shallow. It was more like kickin' dirt over top of 'em.' "

\* \* \* \* \* \* \*

Upon questioning on two additional occasions (when represented by counsel), December 31, 1996 and January 3,

1997, the Defendant stated that regarding the buried female he assisted in the recovery of, he killed her in July of 1994. And, more specifically, on January 3, 1997, the Defendant said that he killed the Victim on July 3, 1994. And when asked why did he kill the girl, the Defendant replied: "Sense of power. I don't know. Vulnerable. I dreaded, just ... I got a very ... got a rush out of it, got a high out of it. Call it what you want. I had no real excuse why other than I *like* to do it. (Pause). I don't know how to describe it."

A review of the Defendant's statements regarding the evidence of robbery is as follows: when the Defendant met the Victim she was fully clothed and was carrying a purse; when he had sex with her, she was partially clothed; after he strangled her, he buried her with no clothing and finally he indicated that after he buried her, he buried her clothing and purse at a separate location.

In an effort to learn the identity of the skeletal remains recovered on December 18, 1996 from the 3200 Block of James Street, dental records of Catherine Magaziner were obtained and compared to the existing teeth in the lower mandible of the remains. Dr. Bernard Levy, who is an expert in forensic dentistry, [ ] He concluded that in his expert opinion the teeth in the lower mandible are that of Catherine Magaziner.

Dr. Margarita Korell, M.D. is an Assistant Medical Examiner in the Office of the Chief Medical Examiner. On December 19, 1996, Dr. Korell performed a postmortem examination of the skeletal remains of Catherine Magaziner. [ ] As an expert in forensic pathology, Dr. Korell concluded that the autopsy findings and circumstances surrounding the victim's death as related to her by Detective Pennington indicate that she most probably died of asphyxia. Asphyxiation can result from strangulation or choking.

\* \* \* \* \* \*

Detective Pennington would identify the defendant seated at the trial table as the individual that he knows to be Joe R. Metheny.

The robbery and murder of Catherine Magaziner did occur in Baltimore City.

(Quotations and emphasis in original).

The State produced other evidence before the jury during the sentencing phase, including the four statements Appellant made while being questioned by the police and additional scientific evidence confirming that the victim was indeed Ms. Magaziner. The defense presented evidence bearing on Appellant's family background, difficult childhood, his history of substance abuse, his military service, continual employment, and his status as a father, as mitigating factors.

The judge directed the jury to complete the mandatory verdict sheet as it deliberated Appellant's fate and to sign the verdict sheet at the end of deliberations. The verdict sheet required the jurors to answer a set of questions as part of their sentence consideration. In Section III, the jury was asked to determine whether the State proved beyond a reasonable doubt that Appellant murdered Ms. Magaziner while committing or attempting to commit a robbery.[7]

The trial judge instructed the jury on the death penalty and the statutory aggravating circumstances as follows:

Now, before a death sentence can be considered by you, the first degree murder must have been accompanied by the aggravating circumstance alleged by the State. Now, the only aggravating circumstance which you may consider is described in paragraph (10) of Section III [of the written verdict sheet], namely, the robbery allegedly committed during the commission or attempting to commit first degree murder of Cathy Magaziner. You should skip and not consider any of the other paragraphs of Section III. The

---

7. Maryland Code (1957, 1996 Repl.Vol., 1999 Supp.), Article 27, § 413(d) mandates, in determining the sentence of death, that the jury consider whether, beyond a reasonable doubt, an aggravating circumstance exists in a murder case. Section 413(d)(10) specifically lists robbery as an aggravating circumstance. It requires consideration of whether "[t]he defendant committed the murder while committing or attempting to commit a carjacking, armed carjacking, robbery, arson in the first degree, rape or sexual offense in the first degree."

State has alleged this robbery as its only aggravating circumstance and must prove this aggravating circumstance beyond a reasonable doubt, as I have already described this to you. Now, a finding that the aggravating circumstances as alleged by the State in this case exists must be unanimous by you.

You are instructed that robbery is the taking and carrying away of the property of another from their person or from their presence by force or by threat of force and with the intent to permanently deprive that person of that property. In a robbery, the value of the property taken is not an essential element of the offense, so long as the proof shows that something of value was taken.

For the offense of robbery, the robbery need not be completed until after the victim's death, and the killing alone may constitute the element of force. You are instructed that, for the offense of robbery, the intent to steal or take the property of another permanently need not be formed until after the force. Even if the force results in death, a taking after death may nevertheless be robbery. You are further instructed that property is taken from the victim's presence if it is within the victim's control, so that the victim could have prevented its taking had the victim not been killed.

Now, as I have indicated to you, an intent to kill is necessary for first degree murder and an intent to permanently deprive the person of the property is an element of the offense of robbery. You are instructed that intent is a state of mind and ordinarily cannot be proven directly, because there is no way of looking into a person's mind. Therefore, a Defendant's intent may be shown by surrounding circumstances. In determining the Defendant's intent, you may consider the Defendant's acts and statements, as well as the surrounding circumstances, and you may, but are not required to infer, that a person ordinarily intends the natural and probable consequences of their acts.

You are further instructed that motive is not an element of first degree murder or robbery. However, you may

consider the motive or lack of motive as a circumstance in this case. You should give the presence or absence of motive, as the case may be, the weight you believe it deserves.

Now, in determining whether the aggravating circumstance alleged by the State under Section III exists in this case, you must consider whether the State has proven, beyond a reasonable doubt, as I have already defined that for you, that Joe Metheny committed the murder of Cathy Magaziner while committing or attempting to commit robbery.

Actually, at one point in my instructions I think I said robbery while attempting to commit murder. It is the other way around. It is as I have just described to you, ladies and gentlemen. It is whether you are persuaded beyond a reasonable doubt that Joe Metheny committed the murder of Cathy Magaziner while committing or attempting to commit robbery.

Ladies and gentlemen, if you do not find beyond a reasonable doubt that the murder occurred during the commission or attempt to commit robbery, the aggravating factor alleged by the State, then you must check not proven as to this item under Section III. If you do find beyond a reasonable doubt that the aggravating factor exists, that is, that Joe Metheny did commit the murder of Cathy Magaziner while committing or attempting to commit robbery, then you must check proven as to Subparagraph (10) in Section III. Now, if this Subparagraph (10) is checked not proven, you must then proceed directly to Section VI and state that conclusion in writing by filling in life imprisonment in the space at the end of Section VI. If life imprisonment is entered in Section VI, then you must proceed directly to Section VII.

No objection to these instructions was lodged.

The jury found the aggravating circumstance to exist. In Section IV of the verdict sheet, the jury was asked to consider whether mitigating circumstances existed that may warrant Appellant receiving life imprisonment rather than the death

sentence.[8] Responding only to the catch-all query in Section IV regarding "additional mitigating circumstances," one or more, but fewer than all of the members of the jury found that Appellant's life history and drug history constituted mitigating circumstances. The same query, however, also elicited the following unelaborated response: "There is some concern that the circumstances of the robbery constitute sufficient aggravating circumstances." Despite finding the articulated mitigating circumstances and some apparent confusion over whether the sole aggravating circumstance properly existed, the jury unanimously determined in Section V of the verdict sheet that the gravity of the murder outweighed the mitigating circumstances.[9] The jury then, in Section VI of the verdict sheet, unanimously determined that the sentence should be death.

The trial judge imposed the death sentence.[10] Having done so, however, the judge subsequently expressed his personal reservations about the sentence, noting in particular, the

---

**8.** Maryland Code (1957, 1996 Repl.Vol., 1999 Supp.), Article 27, § 413(g) mandates, after a finding beyond a reasonable doubt that an aggravating circumstance exists, the fact finder to take broad consideration of mitigating circumstances before imposing the sentence of death. Section 413(g)(8) mandates consideration of "[a]ny other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case."

**9.** The "weighing" phase of the verdict sheet is mandated by Maryland Code (1957, 1996 Repl.Vol., 1999 Supp.), Article 27, § 413(h) which states, in pertinent part, that:

(1) If the court or jury finds that one or more of these mitigating circumstances exist, it shall determine whether, by a preponderance of the evidence, the aggravating circumstances outweigh the mitigating circumstances.
(2) If it finds that the aggravating circumstances outweigh the mitigating circumstances, the sentence shall be death.
(3) If it finds that the aggravating circumstances do not outweigh the mitigating circumstances, a sentence of death may not be imposed.

**10.** *See* Maryland Code (1957, 1996 Repl.Vol., 1999 Supp.), Article 27, § 413(k)(1) which states: "[i]f the jury determines that a sentence of death shall be imposed under the provisions of this section, then the court shall impose a sentence of death." *See also Burch v. State,* 358 Md. 278, 747 A.2d 1209 (2000) (holding that because trial judge is bound to impose death penalty when jury determines sentence shall be

apparent concern of some of the jurors as to the sole aggravating circumstance stated in its response to the mitigating circumstances in Section IV of the verdict sheet.[11] In the sentencing report filed with this Court, the trial judge stated, in part, that:

> The only reservation this Court has with respect to the death penalty in this case involves the circumstance that this defendant was only eligible for the death penalty because of the robbery. The robbery involved the taking of the victim's clothing and pocketbook after the defendant had killed the victim, and burying those items in a location different from where the naked body of the victim was buried. Another person who had killed their victim as the defendant did, but buried the victim in her clothes would not qualify for the death penalty.
>
> Some of the jurors in the sentencing proceeding seemed concerned about whether the circumstances of the robbery was a sufficient aggravating factor in this case. The Court is likewise concerned that this defendant qualified for the death penalty when another defendant who performed the same acts but buried the victim in her clothes would not qualify.

## I.

Appellant asks us to reverse his robbery conviction because the State failed to prove beyond a reasonable doubt

---

death and thus lacks discretion in such sentencing, court may not exercise sentencing revisory power under Maryland Rule 4–345(b)).

11. The filing of a report by the trial judge is required by Maryland Code (1957, 1996 Repl.Vol., 1999 Supp.), Article 27, § 414(b) which states:

> (b) *Transmission of papers to Court of Appeals.*—The clerk of the trial court shall transmit to the Clerk of the Court of Appeals the entire record and transcript of the sentencing proceeding within ten days after receipt of the transcript by the trial court. The clerk shall also transmit the written findings and determination of the court or jury and *a report prepared by the trial court. The report shall be in the form of a standard questionnaire prepared and supplied by the Court of Appeals of Maryland and shall include a recommendation by the trial court as to whether or not imposition of the sentence of death is justified in the case.* (Emphasis supplied).

that he robbed Ms. Magaziner. He states that the trial court did not have enough "factual basis in support of the guilty plea to robbery." We find no merit in his argument because the record is replete with facts sufficient to find an adequate factual basis for the plea.[12] Before analyzing whether the Circuit Court had before it an adequate factual basis to accept the plea of robbery, we are compelled, in light of Appellant's argument, to examine the nature of guilty pleas generally and the mandatory inquiries necessary to support a valid guilty plea. In particular, we must settle on the proper analytical framework to be employed by the trial court in assessing a factual basis for a guilty plea and what standard of appellate review should be applied to that factual basis determination. Because we apparently have not decided squarely these issues before, we shall look for guidance, in part, to the decisions of the federal courts and the appellate courts of our sister states that have dealt with these questions of law.

### A.

■■ At the outset, we dispose of Appellant's argument that the factual basis for the plea must satisfy the standard of proof that, beyond a reasonable doubt, he robbed Ms. Magaziner.[13] The State carried no such burden during the guilt phase of this case. Appellant's argument is premised on the

---

12. We review the factual adequacy of his guilty plea despite the fact that Appellant pled guilty and, during allocution in the sentencing phase, asked the jury to sentence him to death. Automatic review of death penalty cases is an essential safeguard mandated by the General Assembly and the Maryland Rules. *See* Maryland Code, (1957, 1996 Repl.Vol., 1999 Supp.), Article 27, § 414 and Maryland Rule 8–306. Automatic review in death penalty cases ensures the integrity of capital justice. *See Wuornos v. State,* 676 So.2d 966, 970 (Fla.1996); *Commonwealth v. Graham,* 541 Pa. 173, 661 A.2d 1367, 1369 n. 1 (1995); *Commonwealth v. Appel,* 517 Pa. 529, 539 A.2d 780, 781 (1988). This can only be done by reviewing the conviction of the crimes appealed relating to the imposition of the death penalty, as well as the sentence of death itself.

13. The State seemingly accepts that this was its burden by advocating that the standard of review in this case is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond

fundamental right that "[t]he Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 309, 99 S.Ct. 2781, 2783, 61 L.Ed.2d 560, 567 (1979)(discussing *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). By pleading guilty to the charges, Appellant waived several fundamental rights including the one advanced here, namely "the right to insist that the prosecution's proof at trial establish guilt beyond a reasonable doubt." [14] *See People v. Lesh*, 668 P.2d 1362, 1367 (Colo.1983). *See also Jefferson v. State*, 556 So.2d 1016, 1019 (Miss.1990). The trial judge made it perfectly clear when addressing Appellant during the guilt phase of the proceedings that this right would be forfeited by pleading guilty:

THE COURT: Do you understand the most important right that you are giving up is the right to make the State prove

a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573 [emphasis by the State]. The State cites to *Wiggins v. State*, 324 Md. 551, 567, 597 A.2d 1359, 1366 (1991) and *State v. Albrecht*, 336 Md. 475, 479, 649 A.2d 336, 337–38 (1994) in support of this standard. *Jackson*, *Wiggins*, and *Albrecht*, however, involved convictions arising from contested trials where the prosecution constitutionally bore the burden of proving the crime beyond a reasonable doubt. The convictions did not involve guilty pleas and, therefore, the *Jackson* standard of review of the convictions in those cases is not necessarily applicable to the present case. *Accord Kelley v. Alabama*, 636 F.2d 1082, 1083 (5th Cir.1981)(explicitly refusing to apply the *Jackson* standard to guilty pleas); *Ex Parte Thaddeus Vandehue Williams*, 703 S.W.2d 674, 682 (Tex.Crim.App.1986)(the "rationality" test of *Jackson* has no application to the review of guilty pleas).

**14.** Some other rights waived include (1) the Fifth Amendment privilege against compulsory self-incrimination; (2) the Sixth Amendment right to trial by jury; (3) the Sixth Amendment right to confront one's accusers; (4) the Sixth Amendment right of the defendant to present witnesses to testify on his or her behalf; and (5) the Sixth Amendment right to a speedy and public trial. *See Sutton v. State*, 289 Md. 359, 365, 424 A.2d 755, 758 (1981)(defendant waives the "privilege against compulsory self-incrimination, the right to trial by jury, and the right to confront one's accusers"); *Lesh*, 668 P.2d at 1367 (defendant waives "the right to present witnesses through the use of compulsory process"). *See also Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274, 279 (1969); *State v. Shafer*, 969 S.W.2d 719, 731–32 (Mo.1998).

that you are guilty beyond a reasonable doubt, which is the burden of proof that the State has when you plead not guilty, but the State does not have that burden of proof as to guilt or innocence when you plead guilty. Do you understand that?

[APPELLANT]: Yes, I do.

THE COURT: Do you understand that you are really giving up your right to a trial as to guilt or innocence before a court or before a jury because, as I just said to you, because you are pleading guilty the State does not have the burden of proving that you are guilty? In fact, your guilty plea alone is going to be sufficient to convict you provided it is supported by the statement of facts from the Assistant State's Attorney. You already know what they are and the court already knows what they are, and they are sufficient to support your guilty pleas. So, you are really giving up your right to a trial. Do you understand that?

[APPELLANT]: Yes, Your Honor.

Guilty pleas save judicial resources and are often willingly entered into by the parties to avoid unnecessary financial and emotional expense. *See* 1A Charles Alan Wright, Federal Practice and Procedure § 171.1, at 131–32 (3d ed.1999). Applying the "beyond a reasonable doubt" proof standard would "replicate the trial that the parties sought to avoid." *United States v. Mitchell,* 104 F.3d 649, 652 (4th Cir.1997).

 A guilty plea "is an admission of conduct that constitutes all the elements of a formal criminal charge." *Sutton,* 289 Md. at 364, 424 A.2d at 758. "By entering a plea of guilty, the accused is not simply stating that he did the discrete acts described in the indictment; he is admitting guilt of a substantive crime." *United States v. Broce,* 488 U.S. 563, 570, 109 S.Ct. 757, 762, 102 L.Ed.2d 927, 936 (1989). Indeed, " '[a] plea of guilty is more than a voluntary confession made in open court. It also serves as a stipulation that no proof by the prosecution need [be] advanced.... It supplies both evidence and verdict, [thus] ending [the] controversy.' " *Boykin v. Alabama,* 395 U.S. at 243, n. 4, 89 S.Ct. at 1712, 23

L.Ed.2d at 279 (citations omitted). Once accepted, a guilty plea amounts to a conviction and the only remaining tasks for the court to perform are to impose judgment and conduct sentencing proceedings. *See Boykin,* 395 U.S. at 242, 89 S.Ct. at 1711–12, 23 L.Ed.2d at 279; *Sutton,* 289 Md. at 364, 424 A.2d at 758. The fact that no jury or bench trial is conducted does not make a guilty plea any less functional as a conviction. *See Sutton,* 289 Md. at 364, 424 A.2d at 758. Generally, it "places the defendant in the same position as though he had been found guilty by the verdict of a [fact finder]." *State ex rel. Warren v. Schwarz,* 219 Wis.2d 615, 579 N.W.2d 698, 706 (1998).

## B.

We are not relieved, however, from any appellate scrutiny of the adequacy of the facts supporting the plea. We must consider the issue of what constitutes an adequate factual basis to support a guilty plea and what the proper appellate standard is in reviewing the trial judge's factual basis determination. To commence our analysis, we turn to the origin of the factual basis requirement[15], which is closely associated with the due process mandate that a defendant enter a guilty plea voluntarily.[16]

---

15. The factual basis requirement has also been referred to, in one of the few treatises on the topic, as the "accuracy requirement." *See* John L. Barkai, *Accuracy Inquiries for All Felony and Misdemeanor Pleas: Voluntary Pleas But Innocent Defendants,* 126 U. Pa. L.Rev. 88 (1977).

16. The Maryland Court of Special Appeals has held, contrary to the holdings of our sister states and the federal courts of appeal, that the factual basis determination is mandated by the due process clause in order for a guilty plea to be truly voluntary. *See McCall v. State,* 9 Md.App. 191, 199, 263 A.2d 19, 25 (1970); *State v. Thornton,* 73 Md.App. 247, 254–55, 533 A.2d 951, 955 (1987); *Parren v. State,* 89 Md.App. 645, 648, 599 A.2d 828, 830 (1991). *Contra Berget v. Gibson,* 188 F.3d 518, 1999 WL 586986, \*\*5 (10th Cir.(Okla.) 1999)(unpublished disposition); *Meyers v. Gillis,* 93 F.3d 1147, 1151 (3d Cir.1996); *United States v. Tunning,* 69 F.3d 107, 111 (6th Cir.1995); *Higgason v. Clark,* 984 F.2d 203, 208 (7th Cir.1993); *United States v. Newman,* 912 F.2d 1119, 1123 (9th Cir.1990); *White v. United States,* 858 F.2d 416, 423 (8th Cir.1988); *Smith v. McCotter,* 786 F.2d 697, 702 (5th Cir.

 It is fundamental that a guilty plea must be entered into voluntarily and intelligently; otherwise it has been obtained in violation of the accused's due process rights and is void. *See McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418, 425 (1969); *Davis v. State*, 278 Md. 103, 110, 361 A.2d 113, 117 (1976). *See also Boykin*, 395 U.S. at 242–43, 89 S.Ct. at 1711–12, 23 L.Ed.2d at 279; *State v. Sanders*, 331 Md. 378, 386, 628 A.2d 209, 213 (1993); *Harris v. State*, 295 Md. 329, 335, 455 A.2d 979, 982 (1983); *State v. Priet*, 289 Md. 267, 275, 424 A.2d 349, 353 (1981). For the federal courts, Rule 11 of the Federal Rules of Criminal Procedure sets forth the procedure for the acceptance of a guilty plea. It states in pertinent part:

(c) **Advice to Defendant.** Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform the defendant of, and determine that the defendant understands, the following:

(1) the nature of the charge to which the plea is offered

. . .

(d) **Insuring That the Plea is Voluntary.** The court shall not accept a plea of guilty or nolo contendere without

---

1986); *Willbright v. Smith*, 745 F.2d 779, 780 (2d Cir.1984); *Wallace v. Turner*, 695 F.2d 545, 547 (11th Cir.1983); *Edwards v. Garrison*, 529 F.2d 1374, 1376 (4th Cir.1975); *People v. Hoffard*, 10 Cal.4th 1170, 43 Cal.Rptr.2d 827, 899 P.2d 896, 903 (1995); *Butler v. State*, 658 N.E.2d 72, 75–76 (Ind.1995); *Lacy v. People*, 775 P.2d 1, 5 (Colo.1989)(en banc); *State v. Barboza*, 115 N.J. 415, 558 A.2d 1303, 1306, n. 1 (1989); *State v. Superior Court of County of Maricopa*, 157 Ariz. 71, 754 P.2d 1346, 1348 (1988). *Cf. Paulsen v. Manson*, 203 Conn. 484, 525 A.2d 1315, 1318 (1987)(overruling prior cases that held the factual basis requirement was constitutionally mandated in light of federal courts of appeal precedent). Because this issue is not squarely before us, and Appellant is not contesting the voluntariness of his guilty plea, we need not decide if the factual basis requirement is constitutionally derived. We note, however, that even in those jurisdictions that have decided that a factual basis is not required by due process, it has been held that the determination is still mandated by rule and that the failure to meticulously acquire a factual basis infects the record with inherent untrustworthiness and substantially increases the likelihood of reversing the guilty plea. *See United States v. Fountain*, 777 F.2d 351, 357 (7th Cir.1985).

first, by addressing the defendant personally in open court, determining that the plea is voluntary and not the result of force or threats or of promises apart from a plea agreement. The court shall also inquire as to whether the defendant's willingness to plead guilty or nolo contendere results from prior discussions between the attorney for the government and the defendant or the defendant's attorney.

Federal Rule 11 "is substantially a restatement of existing law and practice" namely, the "duty of [the] court to ascertain that [a] plea of guilty is intelligently and voluntarily made." Fed. R.Crim. Pro. 11 (advisory committee note 1)(1944) (citations omitted). In addition to the knowing and voluntary mandates, Federal Rule 11(f), initially adopted in 1966 with subsequent modifications, requires a factual basis for the plea. It states, in present form, that: "[n]otwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea." Fed. R.Crim. Pro. 11(f).

Maryland Rule 4–242(c) closely parallels Federal Rule 11. *See Priet,* 289 Md. at 282, 424 A.2d at 357(analogizing former Rule 731 c, now Rule 4–242(c), with the Federal Rules). It states in pertinent part:

The court may accept a plea of guilty only after it determines, upon an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, that (1) the defendant is pleading voluntarily, with understanding of the nature of the charge and the consequences of the plea; and (2) there is a factual basis for the plea.

The factual basis determination serves several purposes, but mainly as a safeguard that the accused not be convicted of a crime that he or she did not commit. In *McCarthy,* the Supreme Court explained that:

Requiring this examination of the relation between the law and the acts the defendant admits having committed is designed to "protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of

the charge but without realizing that his conduct does not actually fall within the charge."

394 U.S. at 467, 89 S.Ct. at 1171, 22 L.Ed.2d at 426 (citation omitted). *See also* 1A Charles Alan Wright, Federal Practice and Procedure § 174, at 197–99 (3d ed. 1999). It also serves as a significant buffer against collateral attack or reversal on direct appeal by providing a more adequate record for review; it reassures the trial judge and the appellate court that the defendant entered the plea competently and willingly; and it can aid the trial court at the sentencing stage. *See* 3 ABA Standards for Criminal Justice, 14–1.6 (1986); 5 Wayne R. LaFave, et al., Criminal Procedure § 21.4(f), at 181 (1999).

A trial court has broad discretion as to the sources from which it may obtain the factual basis for the plea, including a statement of facts agreed to by a defendant and the government, testimony from a defendant, inquiry of the prosecutor or defendant's counsel, and any other appropriate source. *See* 1A Charles Alan Wright, Federal Practice and Procedure § 174, at 204–05 (3d ed. 1999)(discussing the Advisory Committee Note to the 1975 amendment of Rule 11). The Supreme Court has held that a judge satisfies the requirements of Rule 11(f) when he or she "determine[s] 'that the conduct which the defendant admits constitutes the offense charged in the indictment or information or an offense included therein to which the defendant has pleaded guilty.' " *Libretti v. United States,* 516 U.S. 29, 38, 116 S.Ct. 356, 362, 133 L.Ed.2d 271, 282–83 (1995)(citing *McCarthy,* 394 U.S. at 467, 89 S.Ct. at 1171, 22 L.Ed.2d at 426) (footnotes omitted)(citing to Fed.R.Crim.P. 11(f), Notes of Advisory Committee on Criminal Rules (1966)). *See also United States v. Partida–Parra,* 859 F.2d 629, 631 (9th Cir.1988). *Libretti* interprets *McCarthy* and the Rule 11(f) determination as requiring nothing more than for the judge to apply the facts in the record to the law. By parity of reasoning, therefore, under Maryland Rule 4–242(c), when facts are admitted by the defendant and are not in dispute, the judge need only apply the facts to the legal elements of the crime charged to determine if an adequate factual basis exists. We see no

factual dispute in this case. Appellant does not challenge that, in open court, he admitted committing the crime of robbery, the accuracy of the Statement of Facts to which he assented, or the confessions made to the police.

We shall review the judge's application of the facts to the law under the abuse of discretion standard.[17] *See Boswell v. Boswell,* 352 Md. 204, 225, 721 A.2d 662, 672 (1998). Other state courts and the federal courts of appeal apply the abuse of discretion standard to the review of the factual basis determination as well. *See Mitchell,* 104 F.3d at 652; *Higgason,* 984 F.2d at 208; *United States v. Bernaugh,* 969 F.2d 858, 865 (10th Cir.1992); *United States v. Lopez,* 907 F.2d 1096, 1100 (11th Cir.1990); *Butler,* 658 N.E.2d at 77. We have previously defined the abuse of discretion standard as a " 'reasoned decision based on the weighing of various alternatives.' There is an abuse of discretion '*where no reasonable person would take the view adopted by the [trial] court* ' . . . ." *In re Adoption/Guardianship No. 3598,* 347 Md. 295, 312, 701 A.2d 110, 118 (1997) (citations omitted)(emphasis added). We hold, therefore, that a trial court has not abused its discretion in determining that there was a factual basis for the guilty plea if the court had facts from which it reasonably could determine that the defendant was guilty of the crime charged.[18] *Accord Lopez,* 907 F.2d at 1100 (holding that "[t]he

---

17. We note, without deciding, that a different standard of review may be more appropriate in cases where the trial judge undertakes a limited, fact-finding role, i.e. if a factual conflict is present or the facts reveal a defense available to the defendant, in which case a judge may decide to reject the plea. *See* John L. Barkai, *Accuracy Inquiries for All Felony and Misdemeanor Pleas: Voluntary Pleas But Innocent Defendants?,* 126 U. Pa. L.Rev. 88, 129 (1977). *See United States v. Adams,* 961 F.2d 505, 509 (5th Cir.1992)(applying the clearly erroneous standard). *Cf. United States v. Johnson,* 194 F.3d 657, 660 (5th Cir.1999) (refusing to apply the clearly erroneous standard when appellant does not dispute the facts).

18. There is a distinction between the appellate standards of review when a defendant only challenges the factual basis determination and when a defendant challenges the validity of the guilty plea in that it was not entered into voluntarily and intelligently. Generally, we review the validity of the guilty plea as a whole under the "totality of the circum-

standard for evaluating challenges to the factual basis for a guilty plea is whether the trial court was presented with evidence from which it could reasonably find that the defendant was guilty"); *Rhoades v. State,* 675 N.E.2d 698, 702 (Ind.1996)(holding that "[a] trial court may find a sufficient factual basis to support a guilty plea 'when there is evidence about the elements of the crime from which a court could reasonably conclude that the defendant is guilty.' ") (citations omitted); *People v. Barker,* 83 Ill.2d 319, 47 Ill.Dec. 399, 415 N.E.2d 404, 408 (1981) (holding that "[a]ll that is required to appear on the record is a basis from which the judge could reasonably reach the conclusion that the defendant actually committed the acts with the intent (if any) required to constitute the offense to which the defendant is pleading guilty."). (citations omitted).

With this standard in mind, we now turn to the common law definition of the crime of robbery and whether the trial court had an adequate factual basis to accept Appellant's guilty plea to that crime. Robbery is "the felonious taking and carrying away of the personal property of another from his person by the use of violence or by putting in fear." *Williams v. State,* 302 Md. 787, 792, 490 A.2d 1277, 1280 (1985). We have further explained that:

> It is clear that there can be no robbery without a larcenous intent.... Therefore, as larceny is an ingredient of robbery, we look to the components of the former to ascertain the requisite mental element of the latter. Larceny is the fraudulent taking and carrying away of a thing without claim of right *with the intention of converting it to a use other than that of the owner without his consent.* ... Because an intent to steal, the *animus furandi,* must be

---

stances" test. *See Priet,* 289 Md. at 287–88, 424 A.2d at 359–60; *Harris,* 295 Md. at 335–36, 455 A.2d at 982. Appellant has not challenged the validity of his guilty plea, only the adequacy of the factual basis. We, therefore, need not apply the "totality of the circumstances" test here.

present, it follows that larceny, and therefore robbery, is classed as a specific intent crime.

*Hook v. State*, 315 Md. 25, 30–31, 553 A.2d 233, 236 (1989)(emphasis in original) (citations omitted). Furthermore, we have held that the intent to steal must occur at the time of the taking and not necessarily at the time the force is applied to neutralize the victim prior to the robbery. *See Stebbing v. State*, 299 Md. 331, 353, 473 A.2d 903, 914 (1984). Indeed, we have adopted the view, also reached by a majority of other states, which holds that robbery does not require "that the defendant's violence-or-intimidation acts be done for the very purpose of taking the victim's property ... [it is] enough that he takes advantage of a situation which he created for some other purpose ..." *See Stebbing*, 299 Md. at 353–54, 473 A.2d at 914 (citing W. LaFave & A. Scott, Criminal Law § 94, at 701–02 (1972)). We elaborated in *Stebbing* that:

> If the force precedes the taking, the intent to steal need not coincide with the force. It is sufficient if there be force followed by a taking with intent to steal as part of the same general occurrence or episode. Even if the force results in death, a taking and asportation after the death is nevertheless robbery.

299 Md. at 356, 473 A.2d at 915. *Stebbing* is an exception to the general requirement that the intent to commit a crime accompany a forbidden act. *See Harris v. State*, 353 Md. 596, 602, 728 A.2d 180, 182–83 (1999). This exception, however, is justified, in part, because a felon who applies force to neutralize a victim should be held responsible for that action if the felon later decides to take advantage of the situation by robbing the victim. In essence, we have allowed, in such circumstances, for a constructive concurrence of the force and intent to steal at the time of the taking.

 In this case, Appellant argues that his conduct, as admitted in the Statement of Facts, was inadequate to satisfy the elements of robbery. Appellant strains to convince us that the sole factual basis relied on by the State to prove robbery

was contained in one paragraph in the agreed Statement of Facts:

> A review of the Defendant's statements regarding the evidence of robbery is as follows: when the Defendant met the Victim she was fully clothed and was carrying a purse; when he had sex with her, she was partially clothed; after he strangled her, he buried her with no clothing; and finally, he indicated that after he buried her, he buried her clothing and purse at a separate location.

He further states that these facts do not prove "an intent to steal at the time of the taking" and "[t]he fact that he buried the victim's clothing and purse a short distance from the body, rather than in the same grave, fails utterly to demonstrate an intent to steal." Moreover, Appellant claims that he "never appropriated anything belonging to the victim to his own use."

The trial judge was not constrained solely to consideration of the facts contained in the above paragraph. The record contains other unchallenged information, not only in the Statement of Facts, but also from Appellant's own testimonial responses to the court's questions. The paragraph exclusively spotlighted by Appellant is merely a summary of the facts in the Statement of Facts used to support the factual basis determination. Appellant's admission that Ms. Magaziner was not clothed when he buried her is consistent with the fact that her clothing and purse (or any indicia of them) were not found with her remains. The facts also suggest that Appellant removed at least part of the victim's clothing which she had been wearing during sex with Appellant, and buried that property, along with her other clothing and purse, in a separate location than her body. The Statement of Facts details how Appellant tried to help the police locate the purse and clothing and how he indicated to the police that he buried them in a different location. Indeed, Appellant described the clothing in some detail. Moreover, Dr. Rodriquez, the State's forensic anthropologist, stated that had Ms. Magaziner been buried wearing any clothes, he would have expected to have found long-life span articles such as rivets, zippers, seams of jeans, and elastic bands with the body. All of these facts

corroborate Appellant's statements that he removed Ms. Magaziner's clothing and purse to a separate location with the specific intent permanently to deprive her of her property.

The trial judge secured additional facts by inquiring from Appellant, in open court, whether he committed the crime:

THE COURT: Do you understand that you are charged with and pleading guilty to the first and only count in 98–CR–0233 and to the first count of 98–CR–0234. [sic] Count one or the only count in 98–CR–0233 charges you with between May 27th of '94 and December the 18th of 19'96 [sic] with willfully and deliberately and with premeditation and intentionally killing Cathy Ann Magaziner; and the first count of 98–CR–0234 charges you between those same dates of May 27th, 1994 and December the 18th, 1996 with unlawfully robbing Ms. Magaziner and violently stealing from her certain items; namely, money and her clothing? Do you understand that that is what you are charged with and pleading guilty to?

THE DEFENDANT: Yes, sir.

THE COURT: Do you know how somebody commits the crime of premeditated murder and the crime of robbing somebody else? Have you discussed how those crimes are committed with your lawyers? Do you know how the crimes are committed?

THE DEFENDANT: I committed them.

THE COURT: I understand that. Do you know what you have to do in order to commit those crimes? Do you know how somebody commits first degree murder of another person?

THE DEFENDANT: Yes. He thinks about it, plans it, does it.

THE COURT: What about the crime of robbing somebody else? Do you know how that crime is committed?

THE DEFENDANT: Yes. It was committed during the premeditated murder.

THE COURT: By doing what?

THE DEFENDANT: By stealing her clothes and stealing her purse.

We note further that the unchallenged interrogation statements obtained by the police from Appellant substantiate and are consistent with the Statement of Facts.

■ We hold that the trial judge did not abuse his discretion in finding an adequate factual basis to support the guilty plea to robbery, including Appellant's specific intent to rob Ms. Magaziner. Based on the record, the trial judge easily could have made a reasonable determination that Appellant was guilty of robbery with the intent to rob Ms. Magaziner arising subsequent to the murder. Removing and discarding portions of "clothing supports a finding that it was taken and carried away with the intent permanently to deprive the owner of its possession." *Stebbing*, 299 Md. at 352, 473 A.2d at 913. Furthermore, we find Appellant's assertion that he did not use the clothing or purse for his own use to be irrelevant. "The felonious intent element of robbery is not limited to an intent to acquire benefit of a pecuniary nature for oneself." *Id.* We do not concern ourselves with whether Appellant personally used the victim's purse or clothing. "An intent to steal need not include an intention to convert the property to one's own use; it is sufficient that there is an intention to permanently deprive the owner of the property." 2 Wayne R. LaFave and Austin W. Scott, Jr., Substantive Criminal Law § 8.11, at 442 (1986).

## II.

Next, we must determine whether the evidence supports the finding of the statutory aggravator of robbery under Maryland Code (1957, 1996 Repl.Vol., 1999 Supp.), Article 27, § 413(d)(10) sufficient to support capital murder. Appellant presents us with three reasons why the evidence does not support the sentencing jury's finding of the robbery aggravator. First, Appellant argues that the facts of this case do not establish that he ever robbed Ms. Magaziner. Second, he suggests that he is ineligible for the death penalty absent a

felony-murder conviction. Third, Appellant argues that the evidence in this case fails to establish that he committed the murder of Ms. Magaziner in the commission of the crime of robbery. We already have rejected Appellant's first argument and need not address it further. Appellant's other contentions merit further consideration.

### A.

Appellant cites *Stebbing* for the proposition that: "[u]nder the legislative scheme, 'the commission of certain felonies, *underlying a felony murder conviction,* is to be considered an aggravating circumstance in the capital sentencing proceeding.'" 299 Md. at 359, 473 A.2d 903 (emphasis by Appellant). He adds that "[h]ere, there is no conviction of felony murder nor sufficient evidence to support such a conviction." Although not stating it directly, Appellant's emphasis suggests to us that he views *Stebbing* as limiting defendants eligible for death by way of the robbery aggravator in § 413(d)(10) to those convicted of felony-murder. We do not believe that the legislature intended that the statute be so confined.

To determine whether Appellant was eligible for death, we begin by looking at the purpose of the statute and the legislature's intent. The time-honored principles of statutory interpretation that we shall employ in this analysis include:

> [e]very quest to discover and give effect to the objectives of the legislature begins with the text of the statute. If the intent of the legislature is clear from the words of the statute, our inquiry normally ends and we apply the plain meaning of the statute. In other words, we will approach our analysis from a common sense perspective, seeking to give the statutory language its ordinary meaning. In furthering the identified legislative objectives, we avoid giving the statute a strained interpretation or one that reaches an absurd result.

*Huffman v. State,* 356 Md. 622, 627–28, 741 A.2d 1088, 1090–91 (1999) (citations omitted). *See also Thanos v. State,* 332 Md.

511, 525, 632 A.2d 768, 774–75 (1993). In addition to the words of the statute, this Court considers other traditional sources of information, including historical background, prior cases interpreting the statute, and any "other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case." *Kaczorowski v. Mayor and City Council of Baltimore,* 309 Md. 505, 514–15, 525 A.2d 628, 632–33 (1987).

Maryland's capital punishment statute, § 413 of Art. 27, states, in pertinent part, that:

(a) *Separate sentencing proceeding required.*—If a person is found guilty of murder in the first degree, and if the State had given the notice required under § 412(b), a separate proceeding shall be conducted as soon as practicable after the trial has been completed to determine whether he shall be sentenced to death.

\* \* \* \* \* \*

(d) *Consideration of aggravating circumstances.*—In determining the sentence, the court or jury, as the case may be, shall first consider whether, beyond a reasonable doubt, any of the following aggravating circumstances exist:

\* \* \* \* \* \*

(10) The defendant committed the murder *while committing or attempting to commit* a carjacking, armed carjacking, robbery, arson in the first degree, rape or sexual offense in the first degree. [Emphasis added.]

■ We have explained the historical foundation of Maryland's death penalty statute before and need not detail it at length here. *See Tichnell v. State,* 287 Md. 695, 720–24, 415 A.2d 830, 843–45 (1980). The contemporary iteration of § 413 has been shaped largely in response to Supreme Court decisions mandating that the states protect the constitutional rights of defendants facing the ultimate punishment of death. In *Tichnell,* we discussed a series of Supreme Court cases that

provided the impetus for the General Assembly to design § 413 in its present form. *See Tichnell,* 287 Md. at 720–24, 415 A.2d at 843–45 (explaining *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); and the General Assembly's reaction to these cases). *See also Colvin v. State,* 299 Md. 88, 121–27, 472 A.2d 953, 970–72 (1984). We recognize these cases as essentially holding that an arbitrary and capricious imposition of the death penalty is unconstitutional. *Furman* declared that death penalty statutes that provided for unbridled discretion of the imposition of the sentence of death amounted to cruel and unusual punishment. *See Tichnell,* 287 Md. at 720–21, 415 A.2d at 843–44. *Woodson* and *Roberts* struck down death penalty statutes that mandated the sentence of death for the commission of certain first degree murders, no matter how narrow the class. *See Tichnell,* 287 Md. at 722, 415 A.2d at 844. In contrast, *Gregg, Proffitt,* and *Jurek* upheld death penalty statutes that provided for guided discretion before imposition of the death penalty. In upholding the constitutionality of Maryland's death penalty statute in *Tichnell,* we compared it with those statutes upheld by the Supreme Court. We explained:

[t]he death penalty statutes upheld by the Court in *Gregg, Proffitt* and *Jurek* each contained three provisions which guarded against the concerns raised in *Furman.* First, each of the new discretionary statutes provided for a bifurcated trial so that guilt and punishment would be separately determined. Second, imposition of the death penalty was restricted to cases in which certain aggravating circumstances were established. The sentencing authority was also required to consider the existence of mitigating circumstances. The Court stated ... that this type of provision

"guides and focuses the (sentencing authority's) objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death." [citing *Jurek*, 428 U.S. at 274, 96 S.Ct. at 2957, 49 L.Ed.2d at 939].

Finally, the statutes that were upheld provided for expedited appellate review of the death penalty statute as a check against the random or arbitrary imposition of the death penalty.

287 Md. at 723–24, 415 A.2d at 845.

Since the *Gregg–Proffitt–Jurek* trilogy, the Supreme Court has expressly held that proof of the aggravator may be made at the sentencing phase:

[t]o pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Under the capital sentencing laws of most States, the jury is required during the sentencing phase to find at least one aggravating circumstance before it may impose death. By doing so, the jury narrows the class of persons eligible for the death penalty according to an objective legislative definition.

The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase.

*Lowenfield v. Phelps*, 484 U.S. 231, 244–45, 108 S.Ct. 546, 554, 98 L.Ed.2d 568, 581–82 (1988) (citations omitted). The Court further explained:

It seems clear to us ... that the narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses ... so that the jury finding of guilt responds to this concern, or the legislature

may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.

*Lowenfield,* 484 U.S. at 246, 108 S.Ct. at 555, 98 L.Ed.2d at 582. Maryland's death penalty statute follows the latter scheme and mandates narrowing of those eligible for death during the sentencing phase. Indeed, we have explained "[a]lthough narrowing may occur within the definition of first-degree murder, the use of statutorily prescribed aggravating circumstances is a more ideal tool with which to genuinely narrow the class of death-eligible defendants." *Grandison v. State,* 341 Md. 175, 197, 670 A.2d 398, 408 (1995) (citations omitted).

Against this backdrop, we think it is clear that a plain reading of § 413 shows that it does not limit death penalty eligibility for the aggravating circumstance of robbery to only those convicted of felony-murder during the guilt phase. The plain words of § 413(a) state that a person convicted of "murder in the first degree" may be sentenced to death. The words "murder in the first degree" do not distinguish between felony-murder and premeditated murder, both of which are classified as first degree murder under §§ 407–410. In this case, Appellant pled guilty to premeditated murder and robbery. The missing link here is that the State did not prove, nor attempt to prove at the guilt phase, the element of committing the murder during the perpetration of the robbery. The absence of a felony-murder conviction at the guilt phase, however, does not preclude the State from proving, during the sentencing phase, that the murder was committed while in commission of the robbery in order to satisfy the statutory aggravator. *See Commonwealth v. Lee,* 541 Pa. 260, 662 A.2d 645, 656 (1995)(holding that absent a legislative mandate requiring a conviction of the aggravating circumstance "the death penalty statute does not require that a defendant be convicted of the substantive offense under the crimes code in order for a jury to consider it as an aggravating factor"); *State v. Hunter,* 840 S.W.2d 850, 868 (Mo.1992)(holding that robbery aggravating circumstance may be proven

even though defendant did not plead guilty to felony-murder and only to premeditated murder and robbery).

In sum, while the State must prove first degree murder as a prerequisite to death penalty eligibility, the State is not obligated to prove the § 413(d)(10) aggravators during the guilt phase of the trial. We hold, therefore, that a defendant who does not plead guilty to the robbery variation of felony-murder, but does plead guilty to premeditated murder and robbery, is still eligible for the death penalty upon proof of the robbery aggravator. *See Johnson v. State,* 303 Md. 487, 495 A.2d 1 (1985)(defendant convicted of premeditated murder and robbery during guilt phase of trial and sentenced to death under robbery aggravator); *Jones v. State,* 310 Md. 569, 530 A.2d 743 (1987)(affirming first degree murder convictions and death sentence based on finding of robbery aggravator even though defendant was never charged with robbing his victims); *Wiggins v. State,* 324 Md. 551, 597 A.2d 1359 (1991)(affirming premeditated murder and robbery convictions and sentence of death based on finding of robbery aggravator).

Our language in *Stebbing* does not contradict this legislative intent, nor does it foreclose the possibility that a defendant pleading guilty to premeditated murder and robbery, but not felony-murder, may still be eligible for death under the robbery aggravator. *Stebbing* was decided in the context of a felony-murder conviction. Nowhere in our decision did we restrict the death penalty's application of the robbery aggravator solely to felony-murderers.

### B.

Appellant next argues that the evidence presented by the State during the sentencing phase does not support the finding of a statutory aggravating circumstance of robbery beyond a reasonable doubt. While we have already determined that Appellant robbed Ms. Magaziner, we must now decide whether he murdered her "while committing or attempting to commit" a robbery within the meaning of § 413(d)(10).

Appellant analogizes the language of § 413(d)(10) with the language used to describe the felony-murder crimes delineated in §§ 408–410, as well as the Maryland common law definition of felony-murder, to assert that the elements necessary to prove the robbery aggravator are equivalent to that of the robbery variation of felony-murder.[19] He further states:

> Under the felony-murder doctrine, as the malice required to establish murder is imputed from the defendant's "intent to commit a dangerous felony," logic dictates that absent an intent to commit the felony at the time of the killing, there is no felony murder. To impute malice from an intent to steal, arising after the killing is to reason circularly and allows a murder conviction absent "necessary" proof that "the conduct causing death was done in furtherance of the design to commit the felony." Equally troubling, in circuitousness of reasoning, is the prospect of simultaneously looking back in time at the application of force to find a robbery while looking forward in time to the taking of property to find a felony murder, where, in fact, no felony was contemplated when the homicide occurred. Under such reasoning, a reckless homicide followed by a taking of property as an afterthought would be felony murder.

> Moreover, such is inconsistent with the policies underlying the felony-murder rule (to deter the commission of dangerous felonies) and is thus an unwarranted extension of the doctrine.

---

**19.** The relevant felony-murder statute is Maryland Code (1957, 1996 Repl. Vol., 1999 Supp.) Article 27, § 410 which stated:

> All murder which shall be committed in the perpetration of, or attempt to perpetrate, any rape in any degree, sexual offense in the first or second degree, sodomy, mayhem, robbery, carjacking or armed carjacking, burglary in the first, second, or third degree, a violation of § 139C of this article concerning destructive devices, kidnapping as defined in §§ 337 and 338 of this article, or in the escape in the first degree or attempt to escape in the first degree from the Patuxent Institution, any institution or facility under the jurisdiction of the Division of Correction or the Division of Pretrial Detention and Services or from any jail or penal institution in any of the counties of this State, shall be murder in the first degree.

(Citations omitted). Appellant also points to the legislative intent behind the enumerated aggravators in § 413(d)(10). He explains:

The felony-murder doctrine aside, the circumstances of this case do not fall within the conduct contemplated by the General Assembly when it drafted § 413(d)(10). First, the application of this aggravating circumstance to such conduct is not consistent with the plain language used by the General Assembly in defining the statutory aggravating circumstance. The General Assembly did not include all felonies that will support a conviction of felony murder within § 413(d)(10) but limited its application to felonies which necessarily involve the direct application of violence or threat of violence to the person (i.e., rape, robbery, sexual offense) or create a very high risk of death (i.e., arson, carjacking). Conspicuous by its absence, for example, is burglary. From this, it can be inferred that the General Assembly did not contemplate the inclusion of a "robbery" based on a taking of property that was, in fact, an afterthought to the homicide and played no causative role. Second, application of this aggravating circumstance to such conduct is not consistent with the statute's legislative history, which makes clear the legislative intent to narrow, in a rational way, the class of cases eligible for the death penalty.

The real issue here is whether Appellant's actions fall within the scope of culpable conduct punishable by death under the § 413(d)(10) robbery aggravating circumstance. This issue, of course, must be assessed against the posture of the factual record in this case. Probably owing to the passage of time between the contemporaneously undiscovered commission of the crimes in July 1994 and the ultimate revelation of Metheny's involvement during the course of his police interrogation in December 1996 regarding an unrelated murder, the State's case against Metheny was dependent to a great extent on Metheny's uncontradicted and uncontradictable version of what occurred in July 1994. As to what occurred and why, there is but one version, Metheny's. According to that ver-

sion, the consummated crime of murder occurred before the intent arose to deprive permanently the victim of her clothing and purse. There are no disputed facts from which contrary inferences may be drawn. Thus, for purposes of our legal analysis in this case, it is a given that the predicate felony aggravator, robbery, was an afterthought to the murder of the victim.

We conclude, as a matter of statutory interpretation, that the General Assembly's use of the phrase "while committing or attempting to commit" one of the aggravators in § 413(d)(10) conveys a legislative intent that a murder, in order to qualify for punishment by death, must have been connected to the aggravating crime by more than mere coincidence, therefore eliminating from death penalty consideration a robbery committed as an afterthought. Use of the conjunction "while" in tandem with the present participles "committing" and "attempting" denotes more than the aggravating crime occurring at the same time as the counterpart murder. *See Merriam Webster's Collegiate Dictionary* at 1347 (10th ed.1993)(defining conjunction "while" as "during the time that; as long as; when on the other hand; in spite of the fact that; similarly and at the same time that."). Although coincidence in time of the two crimes is obviously an important aspect of the sense of the word, the guided discretion at the heart of the death penalty statute necessarily conveys a requirement of greater connectivity between the two crimes. Thus, a murderer may be convicted, as we have reconfirmed in this case, of an "afterthought" robbery against his or her murder victim, where indisputably the necessary intent is formed *subsequently* to the murder and the requisite element of force is imported from that employed to commit the murder itself, the lawful convictions of murder *and* robbery under such a scenario do not fit within the death penalty scheme under § 413(d) on account of the inherent lack of concurrence between the intents to commit the respective crimes. In order to be death eligible in the present case, the evidence would have had to support the conclusion that Appellant killed Ms. Magaziner at the same time he was robbing her or in furtherance of an

already-formed intent to rob her. Because the evidence in this case is uncontroverted that Appellant did not form the intent to rob the decedent until after he had killed her, as an afterthought, the requisite connection between the two crimes is not satisfied and he may not in turn be put to death for her murder.[20]

As we have already discussed *supra*, Maryland's current iteration of its death penalty was structured under the influence of the *Gregg–Proffitt–Jurek* trilogy. *See Tichnell*, 287 Md. at 723–24, 415 A.2d at 845. Furthermore, although Maryland's death penalty statute was not drafted exactly in the likeliness of any one statute of another state, it is clear that the General Assembly was influenced most significantly by the procedures set forth in the Georgia, Florida, and Texas statutes upheld by the Supreme Court in *Gregg, Proffitt*, and *Jurek*, respectively, as well as the Model Penal Code. *See* Letter from Francis B. Burch, Attorney General of Maryland, to the Honorable Marvin Mandel, Governor of Maryland, 2 Feb. 1977, at 4–5; Memorandum from Thomas J. Peddicord, Jr., Chief Legislative Officer, to the General Assembly, *Capital Punishment—Senate Bill 374 and House Bill 604*, 14 Dec. 1977, at 22 (discussing the development of Maryland's death penalty statute). The relevant wording of the Georgia death penalty statute, however, is substantially different from Maryland's, and, while the Florida and Texas statutes are worded more similarly to Maryland's, they are not particularly helpful, standing alone, in delineating any further the scope of culpable conduct under Maryland's robbery aggravator.[21]

---

**20.** The legislative history of § 413(d)(10) provides little guidance as to the scope of culpable conduct encompassed by the terms "committed the murder while committing or attempting to commit" a robbery. Nor does the statute define these terms under the listed definitions in § 413(c) relating to the death penalty statute.

**21.** Georgia's death penalty statute encompasses far more situations than ours, but the robbery-murder variations are seemingly confined to armed robbery offenses. Ga.Code Ann. § 17–10–30 (Harrison 1998) states, in pertinent part, that the jury may consider the following aggravating circumstances after a murder conviction:

**620**

■ We agree with the Supreme Court of California that a robbery committed as an afterthought to a murder cannot serve as an aggravating circumstance supporting an imposition of the death penalty. In *People v. Green,* 27 Cal.3d 1, 164 Cal.Rptr. 1, 609 P.2d 468, 504 (1980), *overruled in part on other grounds, People v. Hall,* 41 Cal.3d 826, 226 Cal.Rptr. 112, 718 P.2d 99, 104 n. 3 (1986), the jury sentenced the appellant, convicted of murder and robbery among other crimes, to death after finding the special circumstance of robbery (and others) to exist in the commission of the murder. Green killed his wife and removed her clothing and belongings, some during the course of the murder and some after the murder was completed. *See Green,* 164 Cal.Rptr. 1, 609 P.2d at 502. The Court addressed the special circumstance of robbery and scope of culpable conduct punishable by death. It reversed the jury's finding of a special circumstance of robbery and explained that:

[W]e infer that the purpose of the Legislature was to comply insofar as possible with what it understood to be the mandate of *Furman* and *Gregg* et al. At the very least,

---

(1) The offense of murder, rape, armed robbery, or kidnapping was committed by a person with a prior record of conviction for a capital felony;

(2) The offense of murder, rape, armed robbery, or kidnapping was committed while the offender was engaged in the commission of another capital felony or aggravated battery, . . .

(3) The offender, by his act of murder, armed robbery, or kidnapping, knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person;

&ast; &ast; &ast; &ast; &ast; &ast;

(7) The offense of murder, rape, armed robbery, or kidnapping was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.

Fla. Stat. Ann. § 921.141(West 1999) states, in pertinent part, that the "capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any: robbery . . ." may be considered in support of a death sentence.

Tex. Penal Code Ann. § 190.03 (West 1999) states, in pertinent part, that a capital murder occurs when a "person intentionally commits the murder in the course of committing or attempting to commit . . . robbery. . . ."

therefore, the Legislature must have intended that each special circumstance provide a rational basis for distinguishing between those murderers who deserve to be considered for the death penalty and those who do not. The Legislature declared that such a distinction could be drawn, inter alia, when the defendant committed a "willful, deliberate and premeditated" murder "during the commission" of a robbery or other listed felony . . . The provision thus expressed a legislative belief that it was not unconstitutionally arbitrary to expose to the death penalty those defendants who killed in cold blood in order to advance an independent felonious purpose, e.g., who carried out an execution-style slaying of the victim of or witness to a holdup, a kidnaping, or a rape.

The Legislature's goal is not achieved, however, when the defendant's intent is not to steal but to kill and the robbery is merely incidental to the murder "a second thing to it," . . . because its sole object is to facilitate or conceal the primary crime. *In the case at hand, for example, it would not rationally distinguish between murderers to hold that this defendant can be subjected to the death penalty because he took his victim's clothing for the purpose of burning it later to prevent identification, when another defendant who committed an identical first degree murder could not be subjected to the death penalty if for the same purpose he buried the victim full clothed or even if he doused the clothed body with gasoline and burned it at the scene instead.* To permit a jury to choose who will live and who will die on the basis of whether in the course of committing a first degree murder the defendant happens to engage in ancillary conduct that technically constitutes robbery or one of the other listed felonies would be to revive "the risk of wholly arbitrary and capricious action" condemned by the high court plurality in *Gregg* . . . We conclude that regardless of chronology such a crime is not a murder committed "during the commission" of a robbery within the meaning of the [death penalty] statute.

*Id.* 164 Cal.Rptr. 1, 609 P.2d at 505–06 (emphasis added).[22] California's special circumstance of robbery is similar to Maryland's aggravating circumstance of robbery. The relevant statute states that a special circumstance exists if the "murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit" a robbery. Cal.Penal Code § 190.2 (West 1999). *But see People v. Thomas,* 137 Ill.2d 500, 148 Ill.Dec. 751, 561 N.E.2d 57, 71–72 (1990) (in distinguishing and rejecting *Green* approach, stating that Illinois's death penalty "statute imparts no significance to the precise timing of the formation of criminal intent with regard to the various [aggravating] felonies defendant commits" and consequently holding that "a defendant is eligible for the death penalty if he commits murder and one of the specifically enumerated felonies either simultaneously or as part of the same criminal episode").

Because of similarity of language in § 413(d)(10) and the definition of felony-murder. Appellant argues that felony-murder jurisprudence should be considered in our analysis of whether the General Assembly intended for the aggravators to encompass a narrower or broader band of conduct than that

---

22. The concern of the California Supreme Court in *Green* was shared by the trial judge in the present case who noted in his death penalty report that:

> The only reservation this Court has with respect to the death penalty in this case involves the circumstance that this defendant was only eligible for the death penalty because of the robbery. The robbery involved the taking of the victim's clothing and pocketbook after the defendant had killed the victim, and burying those items in a location different from where the naked body of the victim was buried. Another person who had killed their victim as the defendant did, but buried the victim in her clothes would *not* qualify for the death penalty.

We note that the *Green* court also held, in contrast to this Court's decision in *Stebbing,* 299 Md. at 353, 473 A.2d at 914, that under California law, the crime of robbery cannot be committed if the intent to steal is formed after the murder. *See Green,* 164 Cal.Rptr. 1, 609 P.2d at 500–01. Finally, we do not decide here, as did the California Supreme Court in *Green,* that the robbery aggravator cannot be applied in situations where the robbery, even if occurring during the murder, is only incidental to the murder.

doctrine. The strongest indicator of an analogy between felony-murder and the § 413(d)(10) aggravators is the similarity in language between §§ 408–410 and § 413(d)(10). Section § 413(d)(10) requires proof beyond a reasonable doubt that "the defendant committed the murder while committing or attempting to commit a carjacking, armed carjacking, robbery, arson in the first degree, rape or sexual offense in the first degree." Section 410 states that "all murder which shall be committed in the perpetration of, or attempt to perpetrate" a robbery (or other listed felony) is guilty of first degree murder. Many of the felony-murder crimes (i.e. robbery, rape, carjacking, etc.) are also listed as aggravating circumstances. Under Maryland common law, we have held that a felony-murder conviction can be obtained only by the State's proving that the defendant committed the underlying felony and that the death occurred "in the perpetration of [that] felony." *Newton v. State*, 280 Md. 260, 268–69, 373 A.2d 262, 266–67 (1977). Furthermore, the words "committing" and "perpetration" have similar, if not synonymous meaning. *See* 2 Wayne R. LaFave and Austin W. Scott, Jr., Substantive Criminal Law § 7.5, at 222 (1986) (explaining that the "typical modern statute make[s] it murder to cause a death, accidently or intentionally in the commission [or perpetration] or attempted commission [perpetration] of certain named felonies") (citing numerous state felony-murder statutes)(second and third alterations by author) (internal quotation marks omitted). Black's Law Dictionary defines "commission" as "[t]he act of doing or perpetrating (as a crime)" and "perpetrate" as "[t]o commit or carry out (an act, esp. a crime)." Black's Law Dictionary at 264 and 1161 (7th ed.1999).

Although we are not presented with, and thus shall not decide, the question whether an "afterthought" to commit a felony, specifically the intent to rob indisputably formed after a murder, is encompassed by the felony-murder rule and thus may underlie a felony-murder conviction, decisions on this very issue by some other jurisdictions support our conclusion that an afterthought robbery may not serve as a death penalty aggravator, whether alone or in conjunction with any other

aggravator(s). The Supreme Court of Tennessee has aptly stated the two main diverging views regarding "afterthought" situations under that State's felony-murder rule:

> The law does not require that the felony necessarily precede the murder in order to support a felony-murder conviction. The killing may precede, coincide with, or follow the felony and still be considered as occurring "in the perpetration of" the felony offense, so long as there is a connection in time, place, and continuity of action. Where the killing precedes the commission of the felony, however, there is a split of authority between the various jurisdictions as to whether intent to commit the felony must exist concurrent with the commission of the homicide, or whether intent formed after a killing is nonetheless sufficient to bring a case within the felony-murder rule.

*State v. Buggs,* 995 S.W.2d 102, 106 (Tenn.1999). The *Buggs* Court went further to hold that the intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the victim's death.

LaFave and Scott have also noted the split of authority:

> A problem arises concerning felony murder if the death-blow precedes the felony or the attempt, after which the defendant continues on and commits the felony or its attempt. Of course, if the defendant knocks his intended robbery victim on the head to disable him from resistence, thereby intentionally or accidentally injuring him fatally, and thereafter he takes his victim's money, the homicide occurs in the commission of the felony and so constitutes murder (and under most statutes first-degree murder). But what if the robber thus injures him in a fight, with no thoughts of robbing him, and only later seeing his adversary helpless, decides to rob him? There is a split of authority as to whether this constitutes a homicide in the commission of robbery. It would seem that the homicide, done without thought of a felony, could not be "in the commission of" the felony.

2 Wayne R. LaFave and Austin W. Scott, Jr., Substantive Criminal Law § 7.5, at 228 (1986).

Several appellate courts in our sister states, including Pennsylvania, Florida, and California have held that an "afterthought" to commit a felony following the murder of a victim is insufficient to support a felony-murder conviction or the finding of a felony aggravator. Pennsylvania premises its rejection of the "afterthought" scenario on the deterrent purpose of the felony-murder rule. The Pennsylvania Supreme Court has held, in the context of felony-murder, that:

> [w]here an actor kills prior to formulating the intent to commit the underlying felony, we cannot say the actor knew or should have known death might occur from involvement in a dangerous felony because no involvement in a dangerous felony exists since the intent to commit the felony is not yet formulated. Also, the greater deterrent is not necessary, and the rule has no application.

*Commonwealth v. Legg,* 491 Pa. 78, 417 A.2d 1152, 1154 (1980) (citing with approval *Commonwealth v. Spallone,* 267 Pa.Super. 486, 406 A.2d 1146 (1979)). In *Spallone,* the Superior Court cut against the grain of prior Pennsylvania Supreme Court decisions that noted in dicta that the timing of the intent to commit the felony was irrelevant. *See id.* at 1147. The *Spallone* court stated:

> our conclusion comports with the rationale of the felony-murder doctrine. The purpose of the rule is to deter one about to commit a felony in which a reasonable man knows, or should know, that death may result, by making him criminally responsible for any such deaths.... Where, as here, the trier of fact determines that the accused, at the time of the killing, has not formed the intent to commit the felony, a rule designed to deter commission of a contemplated felony can have no effect.

In reversing a jury finding that the intent to rob happened at the time of the homicide, the Supreme Court of Florida explained:

Robbery is "the taking of money or other property which may be the subject of larceny from the person or custody of another when in the course of the taking there is the use of force, violence, assault, or putting in fear." § 812.13(1), Fla. Stat. (1989) (emphasis added). An act is considered " 'in the course of the taking' if it occurs either prior to, contemporaneous with, or subsequent to the taking of the property and if it and the act of taking constitute a continuous series of acts or events." § 812.13(3)(b), Fla. Stat. (1989). Thus, a taking of property that otherwise would be considered a theft constitutes robbery when in the course of the taking either force, violence, assault, or putting in fear is used. We have long recognized that it is the element of threat or force that distinguishes the offense of robbery from the offense of theft ... Under section 812.13, the violence or intimidation may occur prior to, contemporaneous with, or subsequent to the taking of the property so long as both the act of violence or intimidation and the taking constitute a continuous series of acts or events.

*Mahn v. State,* 714 So.2d 391, 396–97 (Fla.1998) (citing *Jones v. State,* 652 So.2d 346, 349 (Fla.1995)) (other citations omitted).

Lastly, in California, under the felony-murder rule, "the evidence must establish that the defendant harbored the felonious intent either prior to or during the commission of the acts which resulted in the victim's death...." *People v. Ainsworth,* 45 Cal.3d 984, 248 Cal.Rptr. 568, 755 P.2d 1017, 1037 (1988) (citations omitted).

Other states have adopted a more expansive view of the scope of punishable actions under a "continuous course of criminal conduct," "continuous occurrence," "same criminal episode," or *res gestae* approach. In *Francis v. State,* the Supreme Court of Georgia held that:

Where, as here, the evidence is sufficient to authorize a finding that the theft was completed after force was employed against the victim, a conviction for armed robbery is authorized " 'regardless of when the intent to take the

victim's [property] arose, regardless of whether the victim was incapacitated and even if the victim had been killed instantly ...' " [I]f the evidence authorizes a finding that the defendant "first killed the victim and then took" the victim's property, he "would be guilty of armed robbery ..." Construing the evidence most strongly in favor of the State, it was sufficient to authorize a rational trier of fact to find proof of Francis' guilt of armed robbery, as well as felony murder, beyond a reasonable doubt.

266 Ga. 69, 463 S.E.2d 859, 860–61 (1995) (citations omitted). *See also Peek v. State,* 239 Ga. 422, 238 S.E.2d 12, 19 (1977) (affirming felony-murder conviction even when intent to commit felony occurred after murder because felony was part of "one continuous course of criminal conduct").

In *State v. Williams,* the Supreme Court of Ohio, in noting the breadth of *State v. Rojas,* 64 Ohio St.3d 131, 592 N.E.2d 1376 (1992), affirmed Williams's conviction of felony-murder after he murdered his first victim, Mr. Melnick, and attempted to rape his second victim, Ms. Melnick, in the same home, and held the following:

Rojas did not rob his victim until hours after he had stabbed her and the case reflects that he did not stab her in order to rob her. In this case, each of the crimes of which Williams was convicted occurred during one continuous incident. Accordingly, Williams should not be able to escape the felony-murder rule by claiming the rape was merely an afterthought.

\* \* \* \* \*

In this case, the murder of Mr. Melnick was "associated" with the attempted rape of Mrs. Melnick "as part of one continuous occurrence."

74 Ohio St.3d 569, 660 N.E.2d 724, 732–33 (1996) (citations omitted).

In *Thomas,* the Illinois Supreme Court, in discussing the circumstances punishable by death, rejected the *Green* approach, explaining:

First, the language of the California statute is different from that of the Illinois statute. The California statute permits the imposition of the death penalty when the jury finds that the defendant committed murder "during the commission or attempted commission of" one of the several enumerated felonies. We think that this language contemplates a shorter time frame than does the "in the course of" language found in the Illinois statute. That is, we think that the Illinois statute recognizes that the crime of murder is not necessarily complete when the victim's heart stops beating, but rather the crime continues throughout the time that the perpetrator conceals the crime and flees the scene. Therefore, the crimes of arson, aggravated arson and murder in this case sufficiently overlapped to support the jury's finding that the murder occurred in the course of the other felonies.

Second, we do not think that the portion of the Illinois death penalty statute under which defendant was found eligible is designed only to apply to murders that "advance an independent felonious purpose." The distinction between murder facilitating arson and arson facilitating murder, which defendant raises, is not determinative. We cannot say, as did the California Supreme Court in interpreting its own statute, that our legislature intended that this portion of the death penalty statute apply only to cases in which the defendant kills in the furtherance of another crime. The language of the Illinois death penalty statute is not that restrictive. It applies with equal force to those situations in which a defendant commits a series of crimes, one of which is murder. The statute imparts no significance to the precise timing of the formation of criminal intent with regard to the various felonies defendant commits . . .

As such, we find that a defendant is eligible for the death penalty if he commits murder and one of the specifically enumerated felonies either simultaneously or as part of the same criminal episode. This rule, furthermore, is consistent

with Federal constitutional precedent which prohibits arbitrary application of the death penalty . . .

148 Ill.Dec. 751, 561 N.E.2d at 71–72.

Virginia takes a *res gestae* approach to determine if the accused committed a crime within the scope of the felony-murder rule. *See Haskell v. Commonwealth*, 218 Va. 1033, 243 S.E.2d 477, 482 (1978). The Court of Appeals of Virginia has explained:

> Under the res gestae theory, the felony murder doctrine applies when the "initial felony and the homicide [are] parts of one continuous transaction, and [are] closely related in point of time, place, and causal connection." We have held that the "[d]eath must be directly related in time, place, and causal connection to the commission of the felony; the felony or acts in furtherance thereof must contribute to cause the death to constitute a 'killing' within the felony-murder statute."

*Montague v. Commonwealth*, 31 Va.App. 187, 522 S.E.2d 379, 381 (1999) (citations omitted).

It appears that the majority view in this country is the more narrow view of felony-murder and thus, there can be no felony-murder where the felony occurs as an afterthought following the killing. *See United States v. Bolden*, 514 F.2d 1301, 1307 (D.C.Cir.1975); *Ex parte Johnson*, 620 So.2d 709, 713 (Ala.1993); *People v. Brannon*, 194 Mich.App. 121, 486 N.W.2d 83, 85–86 (1992), app. denied, 441 Mich. 887, 495 N.W.2d 384 (1992); *State v. Newman*, 605 S.W.2d 781, 787 (Mo.1980); *State v. Montgomery*, 191 Neb. 470, 215 N.W.2d 881, 883–84 (1974); *People v. Joyner*, 26 N.Y.2d 106, 308 N.Y.S.2d 840, 257 N.E.2d 26, 27 (1970); *Legg*, 417 A.2d at 1154; *State v. Buggs*, 995 S.W.2d at 107; *Robertson v. State*, 871 S.W.2d 701, 705 (Tex.Crim.App.1993); *Bouwkamp v. State*, 833 P.2d 486, 492 (Wyo.1992); *But see Hightower v. State*, 901 P.2d 397, 402 (Wyo.1995). This majority view holds that in order to establish felony-murder, the intent to commit the felony must exist prior to or concurrent with the commission of the act causing the death. The minority view is that

felony-murder may be established when the intent to commit the underlying felony arises after the killing if there is a continuity of action or if the killing is part of the same occurrence or episode as the felony.

While it is unnecessary in this case to decide to which of these views Maryland subscribes, because Metheny was not convicted of felony-murder, we consider the subject here solely for the weight it contributes by analogy to the issue before us. That the majority of our sister States has determined that at least concurrence of criminal intents, as well as the commission of the underlying felony and the murder, is required to convict a defendant of first degree felony murder further buttresses our conclusion that the ultimate penalty of death ought to be imposed only where such concurrence is proven to exist.[23]

---

**23.** The Maryland Court of Special Appeals addressed the issue of timing between a murder and a robbery, in a felony-murder context, in *Higginbotham v. State,* 104 Md.App. 145, 655 A.2d 1282 (1995). It held that if the intent to steal from the victim was formed after the murder of the victim, the defendant could be convicted of felony-murder. *See id.* at 159, 655 A.2d 1282. Our intermediate appellate court explained:

> Under *Stebbing,* if a person commits an act of force that causes the death of the victim and then forms the intent to deprive the victim permanently of his property, the taking of the property with that intent may constitute robbery if the act causing the death and the 'taking with intent to steal [are] part of the same general occurrence or episode.' 299 Md. at 353, 473 A.2d 903 (citation omitted).

*Id.* at 158–59, 655 A.2d 1282.

*Higginbotham* went on to hold that:

> [u]nder these circumstances, the robbery could also serve as the underlying felony supporting a first degree felony murder conviction. Pursuant to Maryland Code (1957, 1992 Repl.Vol.), Art. 27, § 410, the act causing the death of the victim must have occurred "in the perpetration of, or attempt to perpetrate" the felony. If the act causing the death of the victim constituted the element of force in the robbery conviction, that act was part of the underlying felony.... Thus, "logic dictates that the murder was committed in the perpetration of the felony" of robbery.

104 Md.App. at 159, 655 A.2d at 1288 (citing *Foster v. State,* 297 Md. 191, 215, 464 A.2d 986 (1983)). The facts in *Foster* are notably distinguishable from this case because there was evidence that Foster formed the intent to steal before she murdered her victim. *See Foster,* 297 Md. at 194, 464 A.2d at 988 (discussing Foster's intentions to rob and kill her victim). The court in *Higginbotham* buttressed its decision

We reiterate that in the present case the State was required to prove the robbery aggravating circumstance beyond a reasonable doubt. "The applicable standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Grandison*, 341 Md. at 246, 670 A.2d at 432. Here, there is no evidence that Appellant murdered Ms. Magaziner while robbing her of her clothing and purse. Indeed, while the murder may have been a factor in creating a situation ripe for robbery, the robbery was not a factor in bringing about the death of Appellant's victim. Ms. Magaziner was killed in furtherance of a murder—the evidence shows Metheny killed her for what he described as his personal pleasure.[24] His conception of the design to rob her of her clothing and purse was not formed until after the murder. Because the intent to steal was formed after the murder, a rational trier of fact could not have found that Appellant murdered Ms. Magaziner while committing the robbery.

---

by noting that § 410 does not explicitly require that the intent to commit the enumerated felonies exist "prior to the commission of the act causing the death of the victim." 104 Md.App. at 159, 655 A.2d at 1288. In so holding, the court rejected expressly *Legg* and *Green*, seemingly upon the rationale that Pennsylvania and California common law conflicted with *Stebbing* in that *Stebbing* holds that a felon may be convicted of robbery even if the force preceded the intent to steal. *See id.* at 162, 655 A.2d 1282. According to *Green*, under California law, the crime of robbery cannot be committed if the intent to steal is formed after the murder. *See* 164 Cal.Rptr. 1, 609 P.2d at 500–01. *Cf. Mahn*, 714 So.2d at 396–97.

We believe *Higginbotham* went too far in stretching the scope of the felony-murder doctrine beyond its traditional foundation in Maryland and that it perhaps misconstrues *Stebbing*.

**24.** It is clear, based on the listed aggravating circumstances in Maryland's death penalty statute, that the General Assembly intended to restrict the types of conduct punishable by death as compared to our sister states. For example, some states list torture or especially heinous murders as aggravating circumstances or capital murder crimes. *See* Cal.Penal Code § 190.2 (West 1999); Fla. Stat. Ann. § 921.141(West 1999); Ga.Code Ann. § 17-10-30 (West 1982); Pa. Stat. Ann. tit. 42, § 9711 (West 1998); Tex. Penal Code Ann. § 190.03 (West 1999). Maryland does not.

Our holding is not inconsistent with *Stebbing*, in which we held the defendant responsible for the application of force that left the victim vulnerable for the commission of a robbery, and therefore affirmed her conviction for robbery. *See Stebbing*, 299 Md. at 353–54, 473 A.2d at 914. Our decision in that case, arising in the context of a capital murder conviction based solely upon the felony-murder rule, did not directly vouch for the sufficiency of Stebbing's "afterthought" robbery as a death penalty aggravator as she was also convicted of committing rape and a first degree sexual offense, all the elements of which simultaneously coincided with the murder. In short, the robbery in *Stebbing* was not necessarily the basis for the felony-murder conviction.

That the force used to steal and the force used to kill are the same does not prove a defendant guilty of committing a murder while committing a robbery. At most, it is evidence of a relation between the murder and the robbery. To satisfy the robbery aggravator for death penalty purposes, the prosecutor must yet prove that the relationship between the two crimes is that the murder was committed with or in furtherance of the robbery. The evidence adduced at Metheny's sentencing proceeding did not prove that beyond a reasonable doubt.

Furthermore, the facts in *Stebbing* easily are distinguishable from the facts of this case. In *Stebbing*, the appellant asked "us to rule as a matter of law that, unless the intent to steal coincides with the use of violence, the crime is not robbery." We held that the jury had ample evidence before it from which to determine that the appellant had formed the intent to steal her victim's clothing when she applied the force that eventually killed her victim. *See Stebbing*, 299 Md. at 353, 473 A.2d at 913. We stated further that the appellant's argument assumed:

that [her] intent when she assaulted [her victim] was solely to assist [her co-felon's] rape and sodomizing of [the victim] and not to rob her. However, [the victim's] jeans and panties, and inferentially the boots which she was wearing,

were pulled from her body when the attack commenced, and the force separated her from control over her purse. From the subsequent discarding of those items, the jury could have inferred that the intent permanently to deprive [the victim] of their possession coincided with the use of force. *Stebbing*, 299 Md. at 353, 473 A.2d at 913. In dismissing the premise of Stebbing's argument, we held that even assuming that appellant formed her intent to steal after application of the force that killed her victim, her robbery conviction would still stand. In concurrence with the majority view of other jurisdictions, this Court held that the intent to steal from someone may arise after the force is applied to the victim. *See Stebbing*, 299 Md. at 353–56, 473 A.2d at 913–15. We also affirmed her sentence of death based on the finding that she murdered her victim while committing robbery, first degree sexual offense, and rape. Each of the three felonies was recognized under our death penalty statute as an aggravator. *See Stebbing*, 299 Md. at 360, 473 A.2d at 917, and the validity of the robbery alone as an aggravating circumstance was neither presented to nor decided by this Court.

In the present case, however, all of Ms. Magaziner's possessions that were removed from her body before application of the force that led to her death were in furtherance of consensual sexual activity. It was not until after her death that Appellant took the balance of her belongings and apparently buried them in a separate location from her body.

On this record, the evidence was insufficient to establish the sole statutory aggravator asserted by the State to justify imposition of the death penalty. Accordingly, we vacate Metheny's death sentence and remand this case to the trial court for new sentencing proceedings, not to include the possibility of a new death sentence as no appropriate statutory aggravator remains. As we discussed, *supra*, Metheny's robbery conviction and resultant sentence are affirmed. We do not reach Appellant's remaining issues.

*SENTENCE OF DEATH VACATED; JUDGMENTS OTHERWISE AFFIRMED; CASE REMANDED TO THE*

*CIRCUIT COURT FOR BALTIMORE COUNTY FOR NEW SENTENCING PROCEEDINGS; COSTS TO BE PAID BY MAYOR AND COUNCIL OF BALTIMORE CITY.*

Dissenting opinion by CATHELL, J., in which BELL, C.J., and ELDRIDGE, J., join.

CATHELL, Judge, dissenting.

I respectfully dissent from the holding of the majority. I do, however, agree with the ultimate result, i.e., that the sentence of death in this case must be vacated.

Mr. Metheny, if the record and the statement he gave at his sentencing hearing are accurate, is a serial murderer. As such, he is the ultimate characterization of evil. There may well be many sincere proponents of the death penalty who would hold to a position that death would be an appropriate penalty for Mr. Metheny's crimes against the State. The Legislature, however, has not established serial murder as a death qualified offense. In other words, a person who commits two or more murders during one incident, can be sentenced to death, but a person who commits one murder a month for twelve months before he is apprehended, i.e., a serial murderer, cannot be sentenced to death.

In my view, the real reason the death sentence was sought in this case is that Mr. Metheny was a heinous serial murderer. Because serial murder is not a death qualified offense in this State, the prosecution sought the death penalty on the premise that Mr. Metheny robbed the victim when he buried the victim's clothing and purse separate from her body. This strategy, which was successfully employed by the State in the circuit court, stretches Maryland's death penalty statute beyond the scope intended by the Legislature.

### A. Conclusion Statements are not Facts

There is simply no *evidence* (as opposed to conclusions) contained in the agreed Statement of Facts, which is sufficient to support a conviction of robbery. In the case *sub judice,* the only evidence in respect to a robbery was what the prosecution gleaned from the statements of the defendant, and then

made its own conclusions—conclusions that were subsequently adopted as facts by both the trial court and, in my view, by the majority in this Court.

Near the beginning of the Statement at issue, it states: "Ms. Magaziner had been in his trailer one hour when the Defendant strangled her, and robbed her of her purse and clothing." The use of the word "robbed" in this sentence is a conclusion, not a fact. At the end of the statement is another sentence that reads: "The robbery and murder of Catherine Magaziner did occur in Baltimore City." The use of the term "robbery," in this context, is a conclusion not a fact. The facts are contained elsewhere in the Statement. They are not hidden. They are expressly identified:

A review of the Defendant's statements regarding the evidence of robbery is as follows: when the Defendant met the Victim she was fully clothed and was carrying a purse; when he had sex with her, she was partially clothed; after he strangled her, he buried her with no clothing; and finally, he indicated that after he buried her, he buried her clothing and purse at a separate [but nearby] location.

Simply stated I do not perceive the above to satisfy the requirements of the crime of robbery.[1]

Maryland courts have consistently distinguished conclusions contained in statements of facts from the facts themselves, holding that determinations as to whether the facts are sufficient to support a finding that an offense has been committed by a defendant, are limited to a consideration of the facts, exclusive of the conclusions reached by the prosecution, or for that matter, conclusions reached by a defendant. In the context of taking a plea, it is the court's function, not the State's or the defendant's, to assess the facts and arrive at conclusions as to the commission of offenses. *See* Md. Rule 4–242(c). As we have said:

---

1. There were additional statements elsewhere in the statement of facts, but no factual statements that contradict the summary furnished the Court.

In Maryland an accused is permitted to plead guilty. Md. Rule 731 a.[2] An acceptable guilty plea is an admission of conduct that constitutes all the elements of a formal criminal charge. *Boykin v. Alabama*, 395 U.S. 238, 243 n. 5, 89 S.Ct. 1709, 1712 n. 5[, 23 L.Ed.2d 274] (1969); *McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 1171[, 22 L.Ed.2d 418] (1969); *Davis v. State*, 278 Md. 103, 110, 361 A.2d 113, 117 (1976). An accused who pleads guilty waives any and all defenses. *See Cohen v. State*, 235 Md. 62, 68, 200 A.2d 368, 371, *cert. denied*, 379 U.S. 844, 85 S.Ct. 84[, 13 L.Ed.2d 49] (1964). *See also Palacorolle v. State*, 239 Md. 416, 421, 211 A.2d 828, 830–31 (1965); *Holloway v. State*, 8 Md.App. 618, 626, 261 A.2d 811, 815 (1970). In addition, such an accused waives the right to a jury or court trial. *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469[, 25 L.Ed.2d 747] (1970); *Hudson v. State*, 286 Md. 569, 599, 409 A.2d 692, 707 (1979). Thus, a plea of guilty, once accepted, is the equivalent of a conviction. Nothing remains but to give judgment and determine punishment. *Boykin*, 395 U.S. at 242, 89 S.Ct. at 1711–12[, 23 L.Ed.2d 274]; *Gans v. Warden*, 233 Md. 626, 628, 196 A.2d 632, 633 (1964); *Biles v. State*, 230 Md. 537, 538, 187 A.2d 850, 851, *cert. denied*, 375 U.S. 852, 84 S.Ct. 111[, 11 L.Ed.2d 79] (1963). *Of course, before a plea of guilty is accepted and judgment is rendered, a trial court must determine that the acts admitted by the accused constitute the elements of the crime charged.* *Boykin*, 395 U.S. at 244 n. 7, 89 S.Ct. at 1713 n. 7[, 23 L.Ed.2d 274 n. 7]. *See Hudson*, 286 Md. at 599, 409 A.2d at 707; *McCall v. State*, 9 Md.App. 191, 200, 263 A.2d 19, 24, *cert. denied*, 258 Md. 729 (1970); *Holloway*, 8 Md.App. at 625, 261 A.2d at 814–15. *See also* Md. Rule 731 c.

*Sutton v. State*, 289 Md. 359, 364–65, 424 A.2d 755, 758 (1981) (emphasis added) (footnote omitted).

The Court of Special Appeals addressed this exact issue, in reference to the acceptance of a guilty plea, in *Parren v. State*,

---

**2.** Current Maryland Rule 4–242 is derived from former Maryland Rule 731 and M.D.R. 731.

89 Md.App. 645, 647–51, 599 A.2d 828, 829–31 (1991). That court noted:

Both guilty pleas were, we now hold, invalid because of the failure of the court on each occasion to satisfy the strict requirements of Md. Rule 4–242(c), which provides, in pertinent part:

"The court may accept a plea of guilty only after it determines, upon an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, that ... (2) there is a factual basis for the plea."

In *State v. Thornton*, 73 Md.App. 247, 533 A.2d 951 (1987), Judge Alpert discussed at some length the requirement that the face of the record reflect, in more than conclusory terms, the factual basis for the plea, pointing out the close relationship between and common provenance of the Maryland Rule and Federal Rule of Criminal Procedure 11. Judge Alpert concluded, at 73 Md.App. at 252, 533 A.2d 951:

"[U]nder both federal and Maryland law, before the court may accept a guilty plea, it must determine on the record ... that a factual basis supports the plea."

The issue that concerns us in this case is the fullness of the factual basis supporting the plea. *State v. Thornton*, at 73 Md.App. [at ]257–258, 533 A.2d 951, quotes with approval from J.L. Barkai, "Accuracy Inquiry for all Felony And Misdemeanor Pleas; Voluntary Pleas But Innocent Defendants?", 126 U.Pa.L.Rev. 88, in terms of how the factual basis for a plea is placed upon the face of the record and how detailed that factual basis must be:

"Although the accused is typically interrogated by the judge, some courts allow the defense attorney or the prosecutor to conduct the questioning. The testimony of these attorneys has also been accepted in some states as a source of the factual basis, provided the defendant is present. A prosecutor's testimony usually consists of a

summary of the evidence he expects to present at trial. This method of establishing a guilty plea's accuracy has been limited at times, however, by requirements that a prosecutor supply concrete facts rather than merely assert that a factual basis exists, and that the truth of the evidence thus summarized be confirmed by the defendant."

*Thornton* then holds unequivocally, at 73 Md.App. at 258, 533 A.2d 951, that a full "statement of facts is indispensable" and that a mere conclusory statement that a factual basis for the guilty plea exists will not suffice:

. . . .

"The factual basis inquiry serves a dual purpose. First, an examination of the law and the acts which the defendant admits he committed 'protect[s] a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the charge.' . . . ." (citation omitted).

. . . .

"An inquiry may be made of the defendant, of the attorneys, or by whatever means is appropriate in a specific case. The inquiry, however, must be sufficient to develop the underlying facts from which the court will determine whether the conduct which the defendant admitted constituted the offense to which he has pled guilty." (citation omitted).

The Court of Special Appeals first applied the requirement that a factual basis be presented in the context of a defendant's plea in *McCall v. State* 9 Md.App. 191, 263 A.2d 19, *cert. denied*, 258 Md. 729 (1970), in reference to a plea of *nolle contendere*, after the Supreme Court of the United States rendered its decision in *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). The Court of Special Appeals held that:

We construe *Boykin* as also requiring, as constitutionally mandated, that the record affirmatively show that there was

a factual basis for the plea. In [*Boykin,* 395 U.S. at 244 n. 7, 89 S.Ct. at 1713 n. 7, 23 L.Ed.2d 274] it quoted from *Commonwealth et [ex] rel. West v. Rundle,* 428 Pa.2d 102, 105–106, 237 A.2d 196, 197–198 [1968]):

> "A majority of criminal convictions are obtained after a plea of guilty. If these convictions are to be insulated from attack, the trial court is best advised to conduct an on the record examination of the defendant which should include, *inter alia,* an attempt to satisfy itself that the defendant understands the nature of the charges, his right to a jury trial, *the acts sufficient to constitute the offenses for which he is charged,* and the permissible range of sentences." (emphasis supplied)

Thus in this jurisdiction since *Boykin,* the trial court must determine that the conduct which the defendant admits constitutes the offense charged to which he has pleaded guilty. *Requiring this determination of the relation between the law and the acts which the defendant admits having committed is designed to protect a defendant who is in the position of pleading voluntarily with an understanding nature of the charge but without realizing that his conduct does not actually fall within the charge.* And the record must affirmatively show the acts which the defendant admits which served as the basis for the court's determination. We think it preferable that such determination by the court be made before the acceptance of the plea of guilty.

We point out that the determination of the factual basis for the plea is predicated upon conduct of the defendant which he admits. Therefore, insofar as the acceptance of the guilty plea is concerned, it is not a question of the credibility of the defendant or the weight to be given to facts and circumstances with regard to that conduct nor is it a matter of resolving conflicting information before the court regarding his conduct. The inquiry is not a matter of what the State may be able to prove on a trial of the merits, but is confined to what the defendant admits he did. If the conduct which he admits is not sufficient to constitute the offense to which he pleads guilty, the plea shall not be

accepted. To the extent that this is a departure from our holding in *Gopshes v. State*, 1 Md.App. 396, [230 A.2d 475 (1967)], *Gopshes* is overruled. Of course, the requirement that there must be a factual basis for the plea is to be distinguished from the rule that a valid plea of guilty makes unnecessary the production of evidence to support the indictment. *Fix v. State*, 5 Md.App. 703, 712[, 249 A.2d 224]. An effective plea of guilty obviates the necessity for the State to meet its ' burden of proof of the guilt of the defendant for he has confessed it. We note further, that the rule that the acceptance of a guilty plea is not effective unless the court determines from facts and circumstances appearing in the record that there is a factual basis for the plea is to be distinguished from the rule that the fact that there may have been a defense raised to the crime charged, if there had been no guilty plea, does not, of itself, make an otherwise valid entry of a guilty plea ineffective. See *Palacorolle v. State*, 239 Md. 416, 421[, 211 A.2d 828].

*We believe that Boykin impressed upon the rule followed in this State prior to its opinion with respect to the acceptance of a plea of guilty only the need for the specific inclusion of the three designated constitutional rights and the requirement that the trial court determine, preferably prior to acceptance of the plea, upon proper showing appearing in the record, that there was a factual basis, accepted by the defendant, sufficient to constitute the offense to which the plea was tendered.* So for a guilty plea to be effective after 2 June 1969, there must be compliance with the rule established in this State as refined by *Boykin.* McCall, 9 Md.App. at 199–201, 263 A.2d at 25–26 (some emphasis added).

Additionally, the Court of Special Appeals later noted in *Murphy v. State*, 100 Md.App. 131, 136, 640 A.2d 230, 232 (1994):

Because the agreed statement of facts contained no evidence of "deception ... in addition to any false representation or false representations that there [were] sufficient funds in the drawee bank to cover the check[s]," Art. 27

§ 344(b), appellant's conviction for theft over $300 was improper. The trial court abused its discretion by denying the motion to set aside the verdict. [Alterations in original.]

*See Barnes v. State,* 31 Md.App. 25, 28, 354 A.2d 499, 501 (1976) (stating that, even in a trial based upon agreed statement of facts, accused must be acquitted if evidence is insufficient to sustain conviction).

In addition to discussing the Statement of Facts, the majority relies on the trial court's interrogation of Metheny in reference to his plea, pointing out that the appellant responded affirmatively to the court informing him that he had been charged with robbery. He is then asked: "Do you know how the crimes are committed?" He answers: *"I committed them."* That response is a conclusion, not a fact. Relative to the robbery, he is later asked: "Do you know how that crime is committed?" He responds: "Yes. *It was committed* during the premeditated murder." He is then asked: "By doing what?" He responds: *"By stealing* her clothes and *stealing* her purse." Every emphasized answer is a conclusion, not a fact.

Accordingly, it is clear, as I see it, that, as a matter of law, in assessing the appropriateness of a finding that a defendant has committed an offense based only on a statement of facts, as occurred in the case at bar, the court must look only to the facts proffered in the statement in support of the State's [3] position that the specified offense was in fact committed by the defendant.

The facts proffered in this case, as stated above, or any other *facts* contained in the Statement, or, for that matter, facts contained in any of the four statements of the defendant upon which the Statement of Facts was based, in my view are not sufficient to sustain a conviction for robbery, let alone a finding of an aggravating factor in the context of death sentencing.

---

**3.** Or the defendant's position.

In the present case the error was compounded by the trial court's conveying to the sentencing jury that the defendant had pled guilty to and been not only convicted of robbery, but, by the trial court's assertion to the jury panel of its opinion that Metheny had, in fact, robbed the victim. In its opening remarks to the sentencing jury panel during *voir dire*, the court advised the panel:

> Joe Roy Metheny, was found guilty on his plea of guilty to first degree premeditated murder and robbery.... The Defendant *robbed* the victim of her purse and clothing and buried her in a shallow grave ... and buried her purse and clothing in a separate location. [Emphasis added.]

Additionally, in closing argument the State informed the jury that:

> So, you can consider that the Defendant pled guilty, that he entered a plea of guilty to robbery, and you will see when you go to deliberate that there is a typed out statement of facts that were relied on by the Court in convicting the Defendant of the robbery. Those facts are essentially the same as the facts that you had in this courtroom.... [Y]ou may consider ... the fact that the Defendant pled guilty to robbery.

## B. Robbery

*Stebbing v. State*[4] notwithstanding, in Maryland robbery maintains its common law definition. Robbery is "the felonious taking and carrying away of the personal property of another from his person by the use of violence or by putting in fear." *Williams v. State*, 302 Md. 787, 792, 490 A.2d 1277, 1280 (1985). A more descriptive definition is provided by the Maryland pattern jury instruction:

> Robbery is the taking and carrying away of property from someone else [or from [his][her] presence and control], by force or threat of force, with the intent to steal the proper-

---

4. 299 Md. 331, 473 A.2d 903 (1984).

ty. In order to convict the defendant of robbery, the State must prove:

(1) that the defendant took the property from (victim) [or from [his][her] presence and control];

(2) that the defendant took the property by force or threat of force; and

(3) that the defendant intended to steal the property, that is, to deprive (victim) of the property permanently. [Alterations in original.]

MJPI—Cr 4:28, *Maryland Criminal Pattern Jury Instructions* (1987); *see also Maryland Criminal Law,* Section 12.0, *Common Law Robbery in Maryland,* Gilbert & Moylan, (1988 Cumulative Supp.).

We noted in *Harris v. State,* 353 Md. 596, 614, 728 A.2d 180, 188 (1999):

The elements of carjacking differ from the elements of robbery and each offense can be committed without committing the other offense. Robbery is the felonious taking and carrying away of personal property from the person of another, accomplished by force or fear. *State v. Gover,* 267 Md. 602, 606, 298 A.2d 378, 380–81 (1973). *Robbery requires asportation of the property. Ball v. State,* 347 Md. 156, 184, 699 A.2d 1170, 1183 (1997), *cert. denied,* [522] U.S. [1082], 118 S.Ct. 866, 139 L.Ed.2d 763 (1998). Although reference to the intent requirement begs the question before the Court, we note that robbery is a specific intent crime, *and that the specific intent required is the intent to permanently deprive the person of the property. Gover,* 267 Md. at 606, 298 A.2d at 381. [Emphasis added.]

Similarly in *Ball v. State,* 347 Md. 156, 188–89, 699 A.2d 1170, 1185 (1997), *cert. denied,* 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998), we said:

Applying these principles to the facts of this case, we hold that Appellant's use of force against Debra Goodwich satisfied the "force" element of robbery. Debra Goodwich presumably sought to prevent Appellant from removing the items of personal property from her parents' home. In

using force to prevent immediate interference with his possession of the property, therefore, Appellant committed the crime of robbery. From this conclusion, it follows that the property was taken from Debra Goodwich's person or presence, as required under the common law definition of robbery. The law is settled that the victim of a robbery need not be in the same room of the dwelling from which property is taken in order for the "person or presence" element of robbery to be satisfied. *See State v. Colvin,* 314 Md. 1, 19–20, 548 A.2d 506, 515 (1988) (finding that robbery had been committed in victim's presence where the victim was stabbed in different room of the house from which the property was taken). Moreover, it should be noted that Appellant was indicted not only for robbery with regard to the jewelry and other items, but also with regard to Debra Goodwich's 1988 Honda Accord. Appellant stole the vehicle after he murdered Debra Goodwich and as she lay dead in the foyer of the Goodwich home. Even if we had concluded that the elements of armed robbery were not satisfied with respect to the other items, Appellant was at least guilty of armed robbery with respect to the vehicle. *See Stebbing v. State,* 299 Md. 331, 353–54, 473 A.2d 903, 913–14 (holding that taking and asportation of property constitutes robbery even where intent to steal is not formed until after application of force resulting in death), *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984).

Additionally, in *Conyers v. State,* 345 Md. 525, 558, 693 A.2d 781, 796–97 (1997), we said:

The essential elements of the crime of robbery are "the felonious taking and carrying away of the personal property of another, from his person or in his presence, by violence or putting in fear." *West v. State,* 312 Md. 197, 202, 539 A.2d 231, 233 (1988). Robbery with a deadly weapon is not a separate substantive offense, but if the State can prove that a defendant used a deadly weapon during the commission of a robbery, the defendant is subject to harsher penalties. Md.Code (1957, 1996 Repl.Vol.), Art. 27, §§ 486, 488; *see Whack v. State,* 288 Md. 137, 140–41, 416 A.2d 265,

266 (1980), *cert. denied and appeal dismissed,* 450 U.S. 990, 101 S.Ct. 1688, 68 L.Ed.2d 189 (1981). Appellant was convicted of robbery and robbery with a deadly weapon, and he argues that this conviction must be reversed because the State failed to prove the element of taking and carrying away. We hold that the convictions are supported by sufficient evidence.

Ms. Johnson regularly kept some money in her wallet, and, on the night of the crime, Ms. Wilson was told by Ms. Johnson that she had twenty dollars. Mr. Johnson testified that when his wife was at home, her wallet was usually kept in her purse, which was stored out of sight. At the scene of the shooting, Ms. Johnson's purse was found on the floor of her bedroom, and her wallet was found, opened and empty of cash, on top of her dresser. From these facts, we hold that a rational trier of fact could have found a taking and carrying away of Ms. Johnson's personal property beyond a reasonable doubt.

In *Hook v. State,* 315 Md. 25, 30–31, 553 A.2d 233, 236 (1989), we said:

Robbery is a specific intent crime.

It is clear that there can be no robbery without a larcenous intent. . . . Therefore, as larceny is an ingredient of robbery, we look to the components of the former to ascertain the requisite mental element of the latter. Larceny is the fraudulent taking and carrying away of a thing without claim of right *with the intention of converting it to a use other than that of the owner without his consent.* . . . Because an intent to steal, the *animus furandi,* must be present, it follows that larceny, and therefore robbery, is classed as a specific intent crime. *State v. Gover,* 267 Md. 602, 606, 298 A.2d 378 (1973) (citations omitted). One of the elements of robbery is the additional *mens rea* of a specific intent above and beyond the doing of the *actus rea.*

There is absolutely no evidence in this case that the defendant ever intended to commit a robbery, or was, in fact, murdering the victim in order to steal her clothing and purse.

The only evidence relating to why he murdered the victim was that he did it because of a:

> Sense of power. I don't know. Vulnerable. I dreaded, just ... I got a very ... got a rush out of it, got a high out of it. Call it what you want. I had no real excuse why other than I like to do it. I don't know how to describe it.

That is the only reason he ever gave as to why he murdered the victim. There is no evidence that demonstrates an intent to commit a robbery. It is evident that he intended to kill Ms. Magaziner, and that he eventually disposed of her body, clothes, and purse, in an effort to conceal evidence of the murder. Under the circumstances of this case, that is not robbery.

It, standing alone, certainly does not satisfy the intent element of the crime of robbery. Moreover, unlike *Stebbing, supra,* there was no evidence that Metheny ever took the victim's clothes and purse *from her,* even after she was dead. Certainly there is no evidence that he had unclothed her during, or even reasonably close in time to, the application of the force that resulted in her death. In the present case the victim's clothes were in the trailer when he strangled her. Sometime after he killed her, and, given Metheny's affinity for post-mortem sexual activity, it could have been days later, he buried her body. Presumably her clothes and purse were wherever she left them when she voluntarily disrobed, or partially disrobed in order to voluntarily engage in sexual activity with Metheny. At this point he has not asported her clothes or purse.

It is later, after he disposed of her remains, that he takes the evidence in his trailer, the clothes and purse, and transports them to the general vicinity of the location of her remains and buries them as well, nearer to the victim's remains than they had been when they were in the trailer. In my view, Metheny's disposal of the evidence under these circumstances was not the asportation of property, nor does it indicate an intent to permanently deprive someone of their property. As I have said, *supra,* he was disposing of evidence of a murder.

## C. Other Circumstances

The State argues, and the majority agrees, that the circumstances of the offense provide the missing element in the same manner as was supplied in *Stebbing v. State, supra.* To me, this case is distinguishable.

First, I have not been able to discover anywhere in the record before us as to when, relative to her strangulation, the body of the victim was buried. The defendant dug up her skull approximately six months after he buried her in order to have sex with it, therefore, as I have indicated above, it is just as reasonable to suppose that he kept her body for a period of time after the killing for similar purposes without burying it, as it is to surmise that her body was buried contemporaneously with her murder.

That being possible, it can be surmised that there was a period of time when her clothes remained with her. If so, a question is, was the burying of her clothes near her body at a later date, perhaps days after her demise, the 'carrying away', the asportation, of her property? Did it in fact constitute a robbery when he first removed her body and buried it but left her clothes in the trailer? Was he robbing her by separating her body from her clothes? In order for a robbery to exist, the burying of her clothes and purse would had to have been a continuation of the offense of murder, even under *Stebbing.* There is no factual evidence contained in the statement of facts that the burying of the clothes near the body was a part of the same general occurrence of the murder. The clothes could have been buried weeks or even months later. In *Stebbing,* the victim's clothes were forcibly removed during the murder itself as a continuum of the offense, and disposed of relatively contemporaneously,[5] and some of the property, a blue sapphire ring, was kept permanently by one of the perpetrators—there is no similar evidence of intent in the case at bar.

---

**5.** In *Stebbing,* the victim was killed on the evening of April 9, 1980. Both the victim's body and her clothing and purse were disposed of the next day.

*Conyers, supra,* can similarly be distinguished. In that case, there was evidence that Mrs. Johnson, the victim, kept money in her purse. Her purse was found ransacked with all her money missing. From that we held that a trier of fact could find that her money had been transported away during, or just after the murder.

In *Ball, supra,* Ms. Goodwich interrupted a burglary in process at her parent's home, and was murdered by the perpetrator. Items of personal property were taken during the burglary. Additionally, Ms. Goodwich's car was taken as well. We held that his taking of her car, after she was left for dead in the family home, still constituted robbery based on the force used to kill her. In *Ball,* as in the cases discussed *supra,* a clear connection with respect to the timing of the force used and the taking of the property had been established to prove that the robbery was a continuation of the initial offense.

The evidence in the case *sub judice* was all supplied through the statements of the defendant, and the fact portion of the Statement of Facts. It is limited to his statements that he "later" buried the victim's purse and clothes near where he buried her body. There is no evidence of when the clothes were buried. While it is true that the authorities never found them, there is no evidence contradicting the defendant's statement as to where he buried them.[6] One can only surmise that if he had thrown the clothes in the grave with her body, no robbery would be alleged to have occurred. Would there have been a robbery if he had put the clothes she had voluntarily removed back on her after the murder before burying her? Would there have been a robbery if he had left the clothes she voluntarily removed where she put them, until apprehended?

Reviewing the holding in *Stebbing,* further, I note that in that case, we held that the disposal of clothes in dumpsters

---

6. The authorities could not initially find the victim's body either, in spite of being pointed to a location approximately ten feet from where it was eventually found.

and the retaining of the victim's ring, were sufficient to satisfy the specific intent prong of the elements of robbery and that robbery does not require, "that the defendant's violence-or-intimidation acts be done for the very purpose of taking of the victim's property . . . [it is] enough that he take advantage of a situation which he created for some other purpose[.]" *Id.* at 353–54, 473 A.2d at 914 (quoting W. LaFave & A. Scott, Criminal Law § 94 at 701–02 (1972)).

To better understand our holding in *Stebbing* and how it may be distinguished, it is necessary to discuss certain facts of that case. Annette Louise Stebbing and her husband, Bernard Lee Stebbing, offered a ride to Dena Marie Polis, (the step-daughter of Bernard's brother). During the trip Bernard pulled their van to the side of the road and Annette pulled Dena into the back of the van. There, while Dena was still alive, Bernard forcibly disrobed her, and while Annette sat on Dena's chest with her hands around Dena's neck, Bernard raped her. During the rape Annette strangled Dena, killing her. The next day they disposed of the clothing in two separate dumpsters at different locations, but kept the victim's ring. They disposed of the body on the same day in the area of the waterfront "headfirst through a manhole into a sewer." *Stebbing*, 299 Md. at 340, 473 A.2d at 907. We further explained:

> The instant case makes explicit what was implicit in *Midgett* [*v. State*, 216 Md. 26, 139 A.2d 209 (1958) ], namely that there must be an intent to steal at the time of the taking. If the force precedes the taking, the intent to steal need not coincide with the force. It is sufficient if there be force followed by a taking with intent to steal as part of the same general occurrence or episode. Even if the force results in death, a taking and asportation after death is nevertheless robbery. *See Foster v. State*, 297 Md. 191, 464 A.2d 986 (1983), *cert. denied,* [464] U.S. [1073], 104 S.Ct. 985, 79 L.Ed.2d 221 (1984).

*Id.* at 356, 473 A.2d at 915.

*Midgett v. State*, 216 Md. 26, 139 A.2d 209 (1958), implied that there must be an intent to steal at the time of the taking.

It is interesting to note, however, that in *Midgett* we reversed the judgment and sentences of the trial court. In that case, a police officer unexpectedly came upon three men who were waiting in an alley to rob a businessman. One of the men pulled a gun on the officer. When the men attempted to disarm the officer, they were unable to remove his revolver from its holster so they removed the officer's entire belt assembly. Commenting on the proceedings on remand we advised:

> [W]hen the charge of robbery is retried, the trial judge should instruct the jury to the effect that, if it finds that the defendant, by taking and carrying away the equipment of the officer, intended to steal it, then the verdict should be "guilty", but, if it finds that he merely intended to disarm the officer, *without an intent to steal his equipment at the time it was taken and carried away,* then the verdict should be "not guilty".

*Id.* at 43, 139 A.2d at 218 (emphasis added).

There is simply no actual evidence in the case at bar that the defendant at any time contemporaneously with the occurrence or episode of the murder ever acted with larcenous intent in respect to any of the property of the victim. There is even no evidence that the burial of the clothes occurred contemporaneously with the burying of her body. The evidence is to the contrary. Again the events occurred as follows: victim voluntarily partially disrobes in order to have sex with defendant, he murders her, sometime later he buries her, sometime later he buries her clothes in the vicinity of her body. There is nothing more to support the robbery conviction. There is no evidence of any taking. There is no evidence of an intent to steal. In my view, the sparse facts stated above are not enough to establish that a robbery took place. Metheny did not intend to deprive the victim of her clothes and purse at the time he buried them. She was already dead and buried in the ground nearby. I respectfully suggest that the intent to dispose of the items, under the circumstances of this case, is not synonymous with an intent to steal or to rob.

We also based our decision in *Stebbing*, in large part, on a number of out-of-state cases where perpetrators were primarily committing assaults, and then, as an afterthought took money from the victim. None of these cases are factually similar to the present case, although several may be similar to *Stebbing*.[7]

There was evidence in *Stebbing* of force followed by an intent to steal as part of the same occurrence or episode. That type of evidence is not present in the case *sub judice*.

---

7. *See People v. McGrath*, 62 Cal.App.3d 82, 86, 133 Cal.Rptr. 27, 29 (1976) (victim murdered in retribution for homosexual attack on third party; defendant then removed money from victim's pockets); *Rex v. Hawkins*, 3 Carr. & P. 392 (1828) (Where poachers beat a gamekeeper, left him lying on the ground unconscious, and one of them returned and took his money and gun, only the one who returned had committed robbery); *State v. Iaukea*, 56 Haw. 343, 356, 537 P.2d 724, 733 (1975) ("The law does not require that the use of force or the threatened imminent use of force be done for the very purpose of taking the victim's property."); *People v. Jordan*, 303 Ill. 316, 319, 135 N.E. 729, 730 (1922) (victim knocked out in street fight; then victim's money taken); *People v. Pavic*, 104 Ill.App.3d 436, 446, 60 Ill.Dec. 175, 183, 432 N.E.2d 1074, 1082 (1982) (force used in rape of victim remained in effect when money taken from victim's purse nearby), *overruled in part by People v. Pettit*, 101 Ill.2d 309, 78 Ill.Dec. 157, 461 N.E.2d 991 (1984); *State v. Myers*, 230 Kan. 697, 703–04, 640 P.2d 1245, 1250 (1982) (manslaughter slaying of victim during argument; three hours later defendant returned to scene and took wallet and money from the victim's body); *Howard v. Commonwealth*, 313 Ky. 667, 670, 233 S.W.2d 282, 284 (1950) (attempted rape of victim in her home; defendant takes victim's purse when leaving); *State v. Covington*, 169 La. 939, 945–46, 126 So. 431, 433 (1930) (intent to rob need not be present during beating of victim whose money was taken after he appeared to be dead); *Crenshaw v. State*, 13 Md.App. 361, 373, 283 A.2d 423, 430 (1971) (threatened harm to victim's children compelled victim to submit to defendant's sexual attack in her home; attacker then took money when leaving premises; "[t]he same force and coercion was present in the robbery."), *cert. denied*, 264 Md. 746 (1972); *Hope v. People*, 83 N.Y. 418 (1881) (victim forced to reveal combination to safe located on bank premises; key to bank taken from table in victim's bedroom when defendants leaving); *State v. Nathan*, 39 S.C.L. 219 (5 Rich) (1851) (assault with intent to rape; victim pays money to dissuade attacker); *Turner v. State*, 150 Tex.Cr.R. 90, 94, 198 S.W.2d 890, 892 (1946) (victim knocked unconscious in altercation arising out of minor traffic accident; then money taken); *Alaniz v. State*, 147 Tex.Cr.R. 1, 4–5, 177 S.W.2d 965, 967 (1944) (victim beaten to avenge insult; then money taken).

Unlike *Stebbing,* in the present case there is no actual evidence of an intent to permanently, or temporarily, deprive the victim of her property; i.e., no ring. At least in *Stebbing* there was some evidence that at least a part of the property taken during the act of violence, was taken with the intent to convert it to the perpetrator's use. That is not so in the case at bar. Metheny deprived Ms. Magaziner of her life, not her property. In *Stebbing,* and the other cases mentioned, *supra,* there was evidence, that the taking of property occurred during, or just after, the acts of violence, or at least at the time of the disposal of the remains in *Stebbing.*

In the present case, because of the limitations of the abbreviated Statement of Facts there is no evidence of when the items of clothes and the purse were buried in the vicinity of the body, no actual evidence of when any clothes were involuntarily removed, if any were, from Ms. Magaziner. It is clear that none were involuntarily removed during the sexual act or the violent act of strangulation, i.e., during the murder. If the State's logic were to be applied here, i.e., *Stebbing* 's holdings be extended under the facts of this case, Metheny would not have committed a robbery had he buried the victim with her clothes and purse. He would, however, have committed a robbery by burying her property nearby. By extension of that logic, he would also have committed a robbery when he dug up her skull to have sex with it and disposed of it in Pennsylvania, but would not have committed a robbery if he had returned the skull to the victim's grave. I do not believe that it was the intention of this Court that *Stebbing* be extended so far.

In my view the evidence of a robbery in this case does not rise to the level necessary to provide the intent element of robbery, even to the level found in *Stebbing.* Accordingly, I would reverse Metheny's conviction for robbery, hold that there was insufficient evidence of robbery as an aggravating factor and vacate his sentence of death for first degree premeditated murder. The evil of a defendant, the horrendous nature of his crimes, the ultimate impact upon victims, should never be enough to let us forget that it is the Legisla-

ture that creates the penalties that we, as judges, or juries in death penalty cases, are permitted to impose.[8] We, as judges, should not extend the boundaries the Legislature has put in place. Chief Judge Bell and Judge Eldridge join in this dissent.

---

**8.** Other than for common law offenses with no penalty prescribed by statute, and even then the Legislature has the power, and has used it, to, by statute, modify the penalty.